# EXHIBIT 17

ROBERT S. GIANELLI, #82116
JULLY C. PAE, #233565
GIANELLI & MORRIS, A Law Corporation
626 Wilshire Blvd., Suite 800
Los Angeles, California 90017
Tel: (213) 489-1600; Fax: (213) 489-1611
Email: rob.gianelli@gmlawyers.com
        Jully.pae@gmlawyers.com

RAYMOND E. MATTISON, #071850
DON A. ERNST, #65726
ERNST AND MATTISON
1020 Palm Street
P.O. Box 1327
San Luis Obispo, CA 93406
Tel: (805) 541-0300; Fax: (805) 541-5168
Email  rem@emlaw.us

RONALD A. MARRON, #175650
LAW OFFICES OF RONALD A. MARRON
3636 Fourth Avenue, Suite 202
San Diego, CA 92103
Tel: (619) 696-9006; Fax: (619) 564-6665
Email: ron.marron@cox.net

Attorneys for Plaintiffs and the Certified Class


## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY J. IORIO, MAX FREIFIELD, and RUTH SCHEFFER, on behalf of themselves and all others, similarly situated | Case No.: 05-CV-0633-JLS (CAB) |
| | [CLASS ACTION] |
| Plaintiffs, | |
| vs. | |
| ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, INC., | |
| Defendant. | |

_____/

1

## DECLARATION OF PROFESSOR GEOFFREY P. MILLER

1. I am the Stuyvesant P. Comfort Professor of Law at New York University located in New York, New York. I have been retained to provide an expert opinion as to the appropriate award of attorneys' fees and expenses in the above-captioned matter. In that capacity, I make the following representations on the basis of my own personal knowledge. If called as a witness, I could and would competently testify to the matters stated herein.

<u>Background and Qualifications</u>

2. For more than twenty years I have been involved in the area of class action litigation as a teacher, scholar, attorney, consultant, American Law Institute advisor, and expert witness.

3. I teach classes covering class action litigation, including Civil Procedure, Complex Litigation, Corporations, and Professional Responsibility, as well as continuing legal education seminars.

4. I have acted as counsel in both class action and shareholders derivative cases.

5. I have written more than a dozen research articles dealing with class action law and practice. My articles on class actions have been cited by state and federal courts across the United States.

6. One of my major areas of research has been the subject of class action attorneys' fees. With Professor Theodore Eisenberg of Cornell University, I am the author of leading empirical analyses of attorneys' fees in class action cases: *Attorneys Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 27 (2004), and *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 Journal of Empirical Legal Studies 248

2

(2010).  These articles are frequently cited as authority for the determination of reasonable fees in class action cases.[1]

7.  I have consulted with attorneys to assist with issues pertaining to class certification, class settlement, and awards of class counsel fees.  I have been qualified as an expert and testified in class action cases in state and federal courts across the United States, including testimony on the topic of the appropriate award of attorneys' fees.

8.  Further information on my background and qualifications is set forth my resume, attached hereto as Appendix B.

<u>Materials Relied On</u>

9.  In preparing this opinion, I have discussed this case with counsel, examined relevant research papers, and reviewed pleadings and other documents including but not limited to those listed in Appendix A of this Declaration.  In particular, the valuation of Settlement benefits discussed herein is based upon the Declaration of Vincent P. Gallagher, Ph.D., dated February 7, 2011.

---

[1]  In re Trans Union Corp. Privacy Litigation, --- F.3d ----, 2011 WL 117108 (7th Cir. 2011) (Posner, J., relying on Eisenberg-Miller study); Allapattah Services, Inc. v. Exxon Corp., 362 F.3d 739 (11th Cir. 2004); Kay Co. v. Equitable Production Co., --- F.Supp.2d ----, 2010 WL 4501572 (S.D.W.Va. 2010); Velez v. Novartis Pharmaceuticals Corp., 2010 WL 4877852 (S.D.N.Y. 2010); In re Vioxx Products Liability Litigation, --- F.Supp.2d ---- (E.D.La. 2010); In re Lawnmower Engine Horsepower Marketing & Sales Practices Litigation, --- F.Supp.2d ----, 2010 WL 3310264 (E.D.Wis. 2010) (characterizing the Eisenberg-Miller study as "the best indicator of what the market would pay class counsel for their services"); Klein v. O'Neal, Inc., 705 F.Supp.2d 632 (N.D.Tex. 2010); In re Marsh Erisa Litigation, 265 F.R.D. 128 (S.D.N.Y. 2010); In re MetLife Demutualization Litigation, 689 F.Supp.2d 297 (E.D.N.Y. 2010); Braud v. Transport Service Co. of Illinois, 2010 WL 3283398 (E.D.La. 2010); In re Trans Union Corp. Privacy Litigation, 2009 WL 4799954 (N.D.Ill. 2009); Hall v. Children's Place Retail Stores, Inc., 669 F.Supp.2d 399 (S.D.N.Y. 2009); Loudermilk Services, Inc. v. Marathon Petroleum Co. LLC, 623 F.Supp.2d 713 (S.D.W.Va. 2009); In re OCA, Inc. Securities and Derivative Litigation, 2009 WL 512081 (E.D.La. 2009); In re Cardinal Health Inc. Securities Litigations, 528 F.Supp.2d 752 (S.D.Ohio 2007); Turner v. Murphy Oil USA, Inc., 472 F.Supp.2d 830 (E.D.La. 2007) ("the Court will look to Eisenberg and Miller's data sets to determine an average percentage for cases of similar magnitude"); In re Cabletron Sys. Inc. Securities Litigation, 239 F.R.D. 30 (D.N.H. 2006); In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litigation, 447 F.Supp.2d 612 (E.D.La. 2006); In re Chiron Corp. Securities Litigation, 2007 WL 4249902 (N.D.Cal. 2007); In re Lupron Marketing and Sales Practices Litigation, 2005 WL 2006833 (D.Mass. 2005).

<u>The Litigation</u>

10. This action arises out of Defendant Allianz' sale of a type of deferred annuity to senior citizens.  The complaint, initially filed in March 2005, alleges that, while the annuities in question purported to provide an "immediate bonus" to purchasers, in fact they contained onerous penalties and conditions that made the purported bonus effectively a fiction concocted for marketing purposes but without real substance.

11. The complaint alleges that Defendant's conduct with respect to these annuities violated Insurance Code § 10127.10(c) (requiring insurers selling annuities to senior citizens in California to place a notice regarding surrender penalties in 12-point bold print on the cover page or policy jacket) and Insurance Code § 10127.13 (requiring insurers to disclose the surrender penalties and surrender period on the cover or, alternatively, to disclose on the cover or policy jacket the location of that information within the contract).  The complaint also alleges that Defendant used deceptive language in order to disguise the onerous terms of the contracts -- all in alleged violation of § 17200 of the California Business and Professions Code. *Inter alia*, the complaint alleges that Defendant concealed/failed to disclose the manner it would manipulate credited rates (or factors which determine credited rates) to recoup the high sales commissions paid to its sales force and the bonuses promised to purchasers, thereby shifting such costs to the Class.  In addition to demanding redress under the California Business and Professions Code, the complaint seeks a remedy for civil fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief.

12. On July 25, 2006 Chief Judge Gonzalez granted Plaintiff's contested motion for class certification.  Defendant applied for permission to appeal the certification order pursuant to Rule 23(f), claiming that Judge Gonzalez's opinion was infected by manifest error, but the Ninth

4

Circuit denied the request.

13. Defendant then moved to decertify the class, and also moved for summary judgment on a variety of grounds.

14. On July 8, 2008 the court (Honorable Janis L. Sammartino) issued an omnibus decision, granting Defendant's motion for summary judgment in part and denying it in part, declining to decertify the class, and limiting the scope of representative plaintiff Iorio's representation of the class on certain issues. Defendant applied for permission to appeal the denial of decertification pursuant to Rule 23(f), arguing (among other things) that the Court had impermissibly certified a new fraudulent omission claim..

15. On August 8, 2008, while Defendant's second Rule 23(f) petition was still pending, Defendant filed an ex parte motion for clarification of the Court's July 8, 2008 omnibus order. Specifically, Defendant sought "clarification" of whether the Court's decertification order "certified for class action treatment a previously uncertified fraudulent omission claim." Plaintiffs, in opposition, characterized this motion as an impermissible attempt to reargue the unsuccessful class decertification motion. The Court denied that ex parte application on August 18, 2008. Defendant then filed a supplemental letter brief with the Ninth Circuit, in support of its pending Rule 23(f) petition, based on the Court's order denying that ex parte application. Notwithstanding, on October 9, 2008, the Ninth Circuit denied Defendant's second Rule 23(f) petition.

16. Still undeterred, Defendant moved on October 16, 2008 to modify the class definition, establish subclasses, and adopt a trial plan. Among other things, this motion continued Defendant's efforts to decertify Plaintiffs' claims relating to recouping of the bonus. On November 21, 2008, at Allianz' urging, the Court permitted limited supplemental briefing

5

from the parties concerning the scope of certified fraud claims regarding the bonus issue. Ultimately, however, on February 23, 2009, the Court denied Defendant's motion to modify the class definition *et al.*.  Once again, for a third time, Defendant requested that the Ninth Circuit grant permission to appeal the Court's February 23, 2009 order under Rule 23(f).  The Ninth Circuit refused permission to appeal on May 28, 2009.

17. Defendant was not yet finished with its attempt to defeat the class.  On August 24, 2009, it moved to decertify the class punitive damages claim.  This Court denied the motion on October 21, 2009.

18. Trial in the matter was set for March 29, 2010. Based on the progress at mediation reported by the parties, the Court continued trial to April 1, 2010.  In the early morning hours of April 1, 2010, a settlement was reached in principle by the parties.

The Settlement

19.  The parties entered into a stipulation of settlement in June 2010.

20.  The settlement benefits include the following:

(a) Increased penalty-free withdrawals for all Class annuities that are active and in deferral as of June 3, 2010.  The existing penalty-free withdrawal limitations under the annuity contracts are increased to permit the additional penalty-free withdrawal of up to 5% per year and 25% cumulatively.  There are 10,501 class annuities in this category.  (For Class members age 90 or older, the benefit allows an additional penalty-free withdrawal of up to 5% per year, with no cumulative limitation.)  The full value of this settlement benefit is $58.8 million (the amount of surrender penalties avoided if the benefit is fully exercised by those eligible and realized as an increase in annuitization value, discounted for time, and reduced for actuarial predictions regarding mortality and Required Minimum Distributions from qualified annuities). *See,*

6

*Gallagher Decl.*, ¶8.A.  This benefit is automatically available (without any claims process), but the realized value depends upon policy choices made by the Class member (both relating to the exercise of the Settlement's additional free-withdrawal right, and independent from that exercise). *Id.*.  The value of this benefit, reduced for such projected usage, ranges from a low of $13.1 million to a high of $30.7 million. *Id.*

(b) A 3.25% Annuitization Value Credit applicable to Class annuities that are active and in deferral as of June 3, 2010, credited at the time of annuitization if the Class member elects a payout option of life with a guarantee of ten years of payments (or longer).  Again, there are 10,501 class annuities in this category.  The full value of this 3.25% credit (under the settlement's general paradigm for facilitating penalty-free withdrawal of funds from the Class annuities) is $12.8 million (the full amount of the credit if applied to the residual annuitization value for all eligible class members, after full exercise of penalty-free withdrawal rights *supra*, discounted for time, and reduced for actuarial predictions regarding mortality). *Id.*, ¶8.B.  Again, this benefit is automatically available (without any claims process), but the realized value depends upon policy choices made by the Class member. The value of this benefit, reduced for projected usage, ranges from a low of $3.6 million to a high of $4.8 million. *Id.*

(c) For each Class annuity which was fully surrendered prior to June 3, 2010, the proposed settlement provides for a partial refund of the surrender penalties incurred.  The minimum individual settlement payment in this category is equal to $1,000 plus 2.23% of total premium.  Additional amounts are payable based upon the amount of each Class Member's actual out-of-pocket loss of premium, under fixed formulae.  There are 2,280 class annuities in this category.  The value of this benefit, based on Allianz' projection of a 30-40% rate of transfer upon surrender to other companies' annuities (one variable in these formulae), ranges from $12.4

7

Page 419

million to $12.7 million. *Id.*, ¶9. This benefit is automatically paid, and is not affected by any future policy choices or behavior.

(d) For each Class annuity which was annuitized prior to June 3, 2010, the proposed settlement provides for a 3.5% increase of all future annuity payments, so long as the payout option is for a period of life plus a guarantee of 10 years (or longer). If some other non-qualifying payout option has been selected, each Class member has the right to convert to a qualifying life-plus-ten payout and receive the credit. There are approximately 1,300 class annuities in this category (and perhaps as many as 1,332). The full value of this settlement benefit is $3.9 million (if each Class member in this category elects a qualifying life plus ten payout of his contract's residual annuitization value). *Id.*, ¶10. This benefit is automatically available (without any claims process), but the realized value depends upon whether the Class member has elected a life plus ten payout (or elects to convert to such a payout). Reduced for projected usage, the value of this benefit is $0.5 million.

(e) For each Class annuity where a lump sum death benefit claim (or a death benefit claim for payment over a period of less than five years) was processed prior to June 3, 2010, the proposed settlement provides for a cash settlement payment to the beneficiaries of $500 per annuity. There are 1,086 Class annuities in this settlement benefits category, for which this settlement benefit has a total value of $543,000, (plus an additional 27 annuities for which status is uncertain, which may qualify for an additional $13,500 in this benefits category). *Id.*, ¶11. In addition, for Bonus Maxxx annuities in this category, the settlement provides for an additional payment equal to 98.5% of total premium, less withdrawals and the death benefit actually received. There are approximately 137 class annuities receiving benefits under this category. The benefit has a total value of approximately $738,000. *Id.* Both these benefits are

8

automatically available, without any claims process, and are unaffected by policyholder behavior.

21. In addition to these benefits, the settlement provides that Defendant will:

(a) maintain a settlement website containing information for class members;

(b) pay the costs of a settlement administrator (including the costs of class notice, and toll-free telephone, electronic mail, and web support for Class member inquiries);

(c) pay class counsel fees as awarded by the Court, not to exceed $18,000,000 and litigation costs not to exceed $1,300,000; and

(d) pay incentive awards as awarded by the Court, in the amount of $25,000 each to representative plaintiffs Anthony J. Iorio, Max Freifield, and Ruth Scheffer.

<u>Opinion</u>

22. A request for fees in the full unopposed amount of $18.0 million and litigation expenses not to exceed $1.3 million is reasonable and well within the range of awards in similar cases.

<u>General Considerations</u>

23. Courts award fees in class action cases for two purposes: to reward counsel for their services and to ensure that attorneys have adequate incentives to litigate cases which might not otherwise be brought. The present litigation illustrates both rationales. Working entirely on a contingency basis, plaintiffs' attorneys achieved an outstanding result, resulting in many millions of dollars in recovery for class members. Neither these nor any other attorneys would have filed this case if they did not expect to receive adequate compensation for their time, expense, and risk.

<u>Summary of Analysis</u>

24. The following analysis will consider: (a) the implication of Defendant's agreement to pay the amounts requested for fees and expenses; (b) the lodestar/multiplier method for calculating a reasonable fee; (c) the percentage of recovery method of fee calculation; and (d) the reasonableness of the request for litigation costs.

<u>Defendant's Agreement to Separately Pay Fees</u>

25. It is significant that the Defendant has agreed to pay the class' attorneys' fees and expenses (up to a cap), in addition to the direct class relief.

26. In many class actions the attorneys' fees and expenses are awarded out of the amount of the common fund prior to any distribution to the class. This situation presents a risk of conflict of interest because the attorneys for the class are seeking fees from the same "pot" that will be used to compensate their clients. Courts appropriately scrutinize fee requests in such cases to ensure that the attorneys are not seeking excessive fees that would otherwise be payable to the class.

27. In the present action, in contrast, attorneys' fees were only negotiated after the direct class settlement benefits were secured, and Defendant agrees to separately pay the fee out of their own resources, without any reduction in the amount of the class settlement benefits. Such agreements are beneficial to the class because they enhance the effective class recovery. Equally if not more importantly, when negotiated at arms-length such agreements provide inherent assurances as to reasonableness because the defendant is a sophisticated party with its own assets on the line. The Defendant's agreement to pay counsel fees in the present case is evidence that the agreed-on amount is within the range of reason.

10

## The Lodestar Fee Calculation

28.   Under the lodestar approach the Court determines the reasonable hours multiplied by counsels' reasonable hourly rate and then adjusts the resulting product (the lodestar) by a multiplier reflecting features specific to the case under review.

29.   I understand from class counsel that the total lodestar in this case for attorneys' fees exceeds $10,575,000, representing more than 17,400 hours of attorney and other professional time, at billing rates supported as reasonable by (*inter alia*) the Declaration of Gary Greenfield.  I have not attempted to perform a detailed audit of the attorney hours or hourly rate, but note that both appear well within the range of reason given the duration and extent of the litigation of the action, and the quality of the results obtained.

30.   The next step is to calculate the "multiplier."  The requested fee is $18 million. Based on a fee lodestar of $10.575, the multiplier is 1.70.

31.   A multiplier of 1.70 is within the range of reason based on a review of class action cases.  The reasonableness of a 1.70 multiplier is demonstrated by a 2003 study published in the journal *Class Action Reports*.  This study measured lodestar multipliers across a range of cases, as shown in the following table:

11

Table 1: Lodestar Multipliers by Recovery Range, CAR Data

| Recovery Range ($ millions) | No. of Cases | Multiplier |
|---|---|---|
| > $100 | 64 | 4.50 |
| $75 < $100 | 26 | 3.93 |
| $50 < $75 | 37 | 2.75 |
| $30 < $50 | 67 | 2.32 |
| $20 < $30 | 65 | 1.90 |
| $10 < $20 | 153 | 1.97 |
| $5 < $10 | 217 | 1.89 |
| $3 < $5 | 142 | 1.89 |
| $2 < $3 | 98 | 1.63 |
| $1 < $2 | 123 | 1.25 |
| < $1 | 128 | 1.10 |
| All Cases | 1,120 | 3.89 |

**Source: Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Rep. 169 (2003).**

32.   The 1.70 multiplier sought here is below the weighted average for lodestar multipliers in the data set (3.89).  The requested multiplier is also below the average multiplier of 2.75 applicable to cases, such as the present one, with recoveries between $50 and $75 million. (The midpoint of the projected utilization value of the direct class relief under the proposed settlement  is $60.1 million.)

33.   Multipliers of 3 and higher are frequently observed in class action cases, as shown in the following table:

12

Page 424

Table 2:  Lodestar Multipliers of 3.0 or Above

| Case | Multiplier |
|---|---|
| *The Stop and Shop Supermarket Company v. Smithkline Beecham Corp.*, 2005 WL 1213926 (E.D.Pa. 2005) | 15.62 |
| *In re Vitamins Antitrust Litigation (2001 Settlement)*, 398 F.Supp.2d 209 (D.D.C. 2005) | 11.54 |
| *Weiss v. Mercedez-Benz of North America, Inc.*, 899 F.Supp. 1297 (D.N.J. 1995) | 9.3 |
| *Cosgrove v. Sullivan*, 759 F.Supp. 166 (S.D.N.Y. 1991) | 8.84 |
| *In re Rite Aid Corporation Securities Litigation*, 269 F.Supp.2d 603, Fed. Sec. L. Rep. P 92,440, 362 F.Supp.2d 587 (E.D.Pa. 2003) | 6.96 |
| *Steiner v. American Broadcasting Co., Inc.*, 2007 WL 2460326 (C.D.Cal. 2007) | 6.90 |
| *In re 3Com Corp. Securities Litigation*, 1999 WL 1039715 (N.D. Cal. 1999) | 6.67 |
| *In re Triangle Industries Securities Litigation*, [1991-1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,528 (Del. 1991) | 6.6 |
| *In re RJR Nabisco, Inc. Securities Litigation*, [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶96,984 at 94,267 (S.D.N.Y. 1992) | 6.0 |
| *In re Cardinal Health Inc. Securities Litigation*, 528 F.Supp.2d 752 (S.D.Oh. 2007) | 5.85 |
| *In re Charter Communications, Inc., Securities Litigation*, 2005 WL 4045741 (E.D.Mo. 2005) | 5.61 |
| *Roberts v. Texaco*, 979 F.Supp. 185 (S.D.N.Y. 1997) | 5.5 |
| *Craft v. County of San Bernardino*, 2008 WL 916965 (C.D.Cal. 2008) | 5.3 |
| *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 2008 WL 4178130 (S.D.Tex. 2008) | 5.2 |
| *In re Rite Aid Corp. Securities Litigation ("Rite-Aid I")*, 146 F.Supp.2d 706 (E.D. Pa. 2001) | "4.5 to 8.5" |
| *Meijer, Inc. v. 3M*, 2006 WL 2382718 (E.D.Pa. 2006) | 4.77 |
| *In re XCEL Energy, Inc. Securities Litigation*, 364 F.Supp.2d 980 & 364 F.Supp.2d 1013 (D.Minn. 2005) | 4.70 |
| *Maley v. Del Global Techs. Corp.*, 186 F.Supp.2d 358 | 4.65 |

13

| | |
|---|---|
| (S.D.N.Y. 2002) | |
| *Willson v. New York Life Ins. Co.*, 1995 N.Y. Misc. LEXIS 652 (N.Y. Sup. 1996) | 4.6 |
| *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266 (E.D.Pa. 2003) | 4.52 |
| *Feerer v. Amoco Production Co.*, 1998 U.S. Dist. LEXIS 22248 (D.N.M. 1998) | 4.5 |
| *Deloach v. Philip Morris Companies*, 2003 WL 23094907 (M.D.N.C. 2003) | 4.45 |
| *Rabin v. Concord Assets Group, Inc.*, 1991 U.S. Dist. LEXIS 18273, [1991-1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶96,471 (S.D.N.Y. 1991) | 4.4 |
| *In re WorldCom, Inc. Securities Litigation (Underwriter/ Andersen settlement)*, 388 F.Supp.2d 319,; 2005 WL 2293178; 2005 WL 2293181; 2005 WL 1394679 (S.D.N.Y. 2005) | 4.0 |
| *In re Veritas Software Corporation Securities Litigation*, 2005 WL 3096079 (N.D.Cal. 2005) | 4.0 |
| *In re Interpublic Securities Litigation*, 2004 WL 2397190 (S.D.N.Y. 2004) | 3.99 |
| *In re St. Paul Travelers Securities Litigation*, 2006 WL 1116118 (D.Minn. 2006) | 3.91 |
| *Rosenburg v. International Business Machines Corp.*, 2007 WL 2043857 (N.D.Cal. 2007) | 3.89 |
| *In re Infospace, Inc. Securities Litigation*, 330 F.Supp.2d 1203 (W.D.Wa. 2004) | 3.50 |
| *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F.Supp.2d 503 (E.D.N.Y. 2003) | 3.50 |
| *Simon v. KPMG LLP*, 2006 WL 1541048 (D.N.J. 2006) | 3.40 |
| *In re Qwest Communications Intern., Inc. Securities Litigation*, 2007 WL 2087536 (D.Co. 2007) | 3.25 |
| *In re Lucent Technologies, Inc. (Lucent Note Holders Litigation)*, 327 F.Supp.2d 426 (D.N.J. 2004) | 3.21 |
| *In re AOL Time Warner Inc. Securities Litigation*, 2006 WL 3057232 (S.D.N.Y. 2006) | 3.15 |
| *Robert Nichols, et al. v. SmithKline Beecham Corp.*, Civ.A.No. 00-6222 (E.D.Pa. 2005) | 3.15 |
| *In re: Ravisent Technologies, Inc. Securities Litigation*, 2005 WL 906361 (E.D.Pa. 2005) | 3.11 |
| *In re New Mexico Indirect Purchasers Microsoft Corporation Antitrust Litigation*, 140 N.M. 879, 149 P.3d 976 (N.M. App. 2006) | 3.05 |
| *Bailey v. AK Steel Corp.*, 2008 WL 553764 and 2008 WL 495539 (S.D.Oh. 2008) | 3.05 |

14

| *Lan v. Ludrof,* 2008 WL 763763 (W.D.Pa. 2008) | 3.04 |
|---|---|

34. Consideration of the appropriate lodestar multiplier properly takes into account the risks inherent in the litigation. It is obvious that this litigation was risky for the members of the plaintiffs' team. Defendant vigorously and aggressively challenged every step in this litigation. Importantly, in a related nationwide class action, which had "carved out" the *Iorio* class of California senior purchasers, (*Mooney v. Allianz Life Insurance Company of North America,* D. Minn. Case No. 06-545 ADM/FLN), asserting many of the same claims at issue in this case, In that action, in October 2009, Allianz actually prevailed at trial, convincing the jury that despite having misrepresented its products and/or engaged in deceptive practices, the plaintiffs and class were not harmed. *See,* Pl. Ex.28, (*Mooney* jury verdict form). That judgment has become final and the *Mooney* class members received nothing.

In addition to the litigation risk with respect to the merits of this case, clearly represented by the outcome in *Mooney,* Defendant particularly dug in its heels on the issue of class certification -- opposing the class certification motion in this Court, moving for decertification, moving for "clarification" regarding denial of decertification, moving to modify the class definition, and moving to decertify the punitive damages claim, plus three separate Rule 23(f) petitions for review by the Ninth Circuit. As this Court is aware, the denial of class certification effectively spells the "death knell" of most consumer cases given the relatively small amounts at stake, and this case is no different. For example, the average and median individual loss of annuitization value upon surrender, (effectively the maximum measure of the surrender penalties incurred), was $17,600 and $10,200 respectively. The average individual bonus and commission amounts, challenged by Plaintiffs' crediting claims, were approximately $7,500 and $7,500-$11,300, respectively. *See, Gallagher Decl.,* ¶13. While class counsel might have been able to

15

continue to litigate this case on behalf of select individual plaintiffs, had certification been denied or reversed on appeal, the relative challenges of doing so would have been enormous.

35.  Adding to the risk of this case was the fact that this litigation was prosecuted by small law firms, on a purely contingent basis, incurring more than 17,400 hours of attorney time over almost six years of litigation, and $1.27 million in out-of-pocket litigation expenses. Absent a successful outcome and/or award of fees by the Court, class counsel would have received no compensation for this significant investment of time and money.  They had to bet much of the ranch on this case.  Work on this case also precluded other, potentially lucrative employment for these attorneys.  In light of the risks posed by this case, class counsel deserve credit for achieving a substantial settlement.

<u>Percentage of Recovery Cross-Check</u>

36.  The great majority of courts in the United States, including California's State Courts and the Ninth Circuit, approve the percentage-of-recovery method as a "cross-check" for calculating fees in class action cases.  This method calculates a fee as a reasonable percentage of the value generated for the class.  This is the dominant approach in the United States, and is widely used in California's state and federal Courts.

37.  The percentage-of-recovery method has important advantages over the other leading method for calculating fees, the lodestar approach, which takes the produce of counsel's reasonable hours and reasonable hourly rate and adjusts this "lodestar" amount by a "multiplier" to take account of contingency risk and other case-specific factors.  The advantages of the percentage-of-recovery approach include the following:

(a) Unlike the lodestar method, the percentage approach aligns counsel with the interests of the class by giving counsel an economic reward for superior performance.

16

Page 428

(b) The percentage approach more closely aligns class action fees with market rates, since counsel in class actions nearly always bring such cases on a fully contingent basis. Contingent fees in the United States are calculated as a percentage of the recovery obtained for the client.

(c) The percentage approach avoids the perverse incentive of the lodestar approach, under which counsel has an incentive to protract their hours in any case displaying a high probability that the class will recover something.

(d) The percentage approach is straightforward to calculate in any case where the class recovery can be estimated. The lodestar approach, in contrast, imposes on courts the burden of evaluating the reasonableness of counsel's hours and hourly rate.

38.  Given the important advantages of the percentage method and its approval in California and the Ninth Circuit, I utilize this method in evaluating the reasonableness of the foregoing lodestar/multiplier analysis and of the fee request in the instant case.

39.  The first step in the percentage-of-recovery method is to quantify the value obtained for the class. The settlement in the present case has the signal advantage that class members do not need to fill out claim forms; their entitlement to the settlement benefit can be determined automatically from records maintained by Defendant. Because claim forms can sometimes significantly erode the take-up rate for class benefits, the absence of such a requirement is a valuable feature of the present settlement. In some benefit categories, cash settlement payments are automatically issued, and are unaffected by policyholder behavior. Approximately 25%-33% of the settlement value is comprised of such automatically-issued cash benefits. In the other benefit categories, although the right to exercise the benefit is automatic, class members do need to make certain policy elections in order to avail themselves of the settlement benefits and must

17

communicate those elections to Defendant. This will, as a practical matter, reduce the value actually obtained by the class below the maximum benefit which is theoretically available.

40. To address this issue, the following percentage of recovery analysis considers two scenarios: first, as measured against the "full utilization value" (*i.e.*, assuming 100% usage of the actually available benefits); second, as measured against the midpoint of "projected utilization value" (*i.e.*, based on actuarial predictions of actual usage). Under both scenarios, however, actuarial predictions regarding non-elective factors affecting value (*i.e.*, factors other than a class member's voluntary choice), have still been applied.

41. Based on Dr. Gallagher's declaration, the "full utilization value" of the settlement's direct class relief is approximately $89.5 million, and the midpoint of the "projected utilization value" range is $40.4 million. *See, Gallagher Decl.*, ¶7 and *generally*.

42. The settlement provides other elements of value to the class, in addition to these direct class benefits. Attorneys' fees under the common fund doctrine would ordinarily be the responsibility of the class; here they are being paid by the Defendant over and above the class recovery. In estimating the reasonableness of the proposed fee, therefore, the $18.0 million amount of the requested fee must be added to the class recovery. See, e.g., *Lealao v. Beneficial California,* 82 Cal. App. 4th 19, 28 (2000). Likewise, the $1.3 million in costs and expenses[2] would ordinarily be paid by the class, but here are being separately reimbursed by the Defendant. Defendant is also separately paying the costs of settlement administration (a value I estimate at $300,000), and the amounts of the requested incentive payments to representative plaintiffs ($75,000). The direct class relief is not reduced for any of these amounts.

---

[2] The actual litigation expenses requested will be less than the unopposed maximum of $1.3 million, since class counsel have agreed, under the Settlement Stipulation, to forego full recovery of costs and expenses and make a portion of that amount available for direct class relief. *See below.* Such increase in direct class relief does not affect this percentage of recovery analysis.

18

43. When these indirect benefits for the class are accounted for, the total settlement value under the two utilization scenarios is as follows:

| | |
|---|---|
| Full Utilization Value: | $109.2million |
| Projected Utilization Value (Midpoint): | $60.1 million |

44. The requested fee of $18.0 million therefore represents 16.48% of the settlement's full utilization value (*i.e.*, 100% utilization); and 29.95% of the projected utilization value midpoint. Under either scenario, the requested fee is reasonable and within the range of fees that are awarded in similar cases in California and around the United States.

45. Contingency fees in non-class cases range between 33.3% and 50% of the recovery, with the median fee being around 40%. A fee request of between 16.48% (full utilization) or and 29.95% (projected utilization midpoint) of settlement value is reasonable when judged by this comparison.

46. The Ninth Circuit has determined that 25% of the recovery is a "benchmark" award for class action cases, and recognized that percentage fees in the range of 20-30% are generally appropriate. *Hanlon v. Chrysler Corp.*, 150 F. 3d 1011, 1029 (9th Cir. 1998); *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990). The fee award sought in the present case is reasonable when judged by this standard. The projected utilization value midpoint (29.95%) falls within this generally appropriate range, and the full utilization value (16.48%) falls well below the *Hanlon* benchmark.

47. The requested fee is also reasonable when judged against percentage fees awarded in class action cases in California and around the United States. A 1996 study by the National Economic Research Associates (NERA), an economic consulting firm, found that fee awards in settled securities class actions average around 30 percent of the recovery. Table 3 shows average

19

Page 431

and median fee awards for settled securities cases where the settlements ranged from less than $1

million to more than $50 million:

### Table 3: Fee Awards in Settled Securities Class Actions 1991-1996: NERA Data

| Settlement Range (millions) | Number of Settlements | Total Value of Settlements | Total Attorney Fees | Average Attorney Fees as a Percentage of Settlement | Median Attorney Fees as a Percentage of Settlement |
|---|---|---|---|---|---|
| $0.00-$0.99 | 37 | $24,696,750 | $7,617,600 | 30.38% | 30.00% |
| $1.00-$1.99 | 66 | $96,506,502 | $30,642,005 | 31.88% | 33.33% |
| $2.00-$9.99 | 245 | $1,184,141,901 | $381,149,262 | 32.11% | 33.33% |
| $10.00-$49.99 | 76 | $1,488,892,280 | $471,161,635 | 31.72% | 33.15% |
| $50+ | 9 | $571,650,000 | $179,920,000 | 31.48% | 30.00% |
| Total | 433 | $3,365,887,433 | $1,070,490,502 | 31.84% | 33.33% |

Source: Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, Recent Trends IV: What
Explains Filings and Settlements in Shareholder Class Actions? Table 9 (1996).

As can be seen, average and median fees in the NERA study are consistently at or above the 30%

level.  By comparison, the fee sought in the present case represents only 29.95% when measured

against the midpoint of projected utilization value, and only 16.48% when measured against the

full utilization value of the settlement benefits made available to the Class.

48.   The 1996 NERA study also demonstrated that federal circuit fee awards are

consistent with one another.  As shown in Table 4, average awards fell within a narrow range,

from a low of 30.73% in the Fifth Circuit to a high of 32.78% in the Fourth Circuit.  The average

percentage fee in the Ninth Circuit was 32.57%.  The proposed fee here, both when considering

full utilization (16.48%) and projected utilization (29.95%), is clearly reasonable when judged by

this measure:

20

Page 432

**Table 4: Plaintiffs' Attorneys Fees by Federal Circuit: NERA Data**

| Circuit | Number of Settlements | Settlements as a Percentage of Total | Total Value of Settlements | Total Attorney Fees | Average Attorney Fee as a Percentage of Settlement |
|---|---|---|---|---|---|
| | | (Percent) | ----------------(Dollars)--------------- | | (Percent) |
| D.C. | 2 | 0.46 | 6,750,000 | 2,200,000 | 31.67 |
| First | 26 | 6.00 | 82,633,902 | 25,677,884 | 30.99 |
| Second | 69 | 15.94 | 440,285,121 | 139,037,770 | 31.48 |
| Third | 58 | 13.39 | 423,292,596 | 132,738,442 | 32.00 |
| Fourth | 12 | 2.77 | 75,325,000 | 23,716,667 | 32.78 |
| Fifth | 26 | 6.00 | 262,720,500 | 81,420,017 | 30.73 |
| Sixth | 13 | 3.00 | 120,875,000 | 36,921,000 | 31.00 |
| Seventh | 18 | 4.16 | 149,933,784 | 48,375,833 | 31.83 |
| Eighth | 12 | 2.77 | 52,175,000 | 17,640,500 | 32.47 |
| Ninth | 155 | 35.80 | 1,379,894,030 | 450,725,681 | 32.57 |
| Tenth | 13 | 3.00 | 203,650,000 | 62,038,333 | 32.13 |
| Eleventh | 29 | 6.70 | 168,352,500 | 49,998,375 | 29.92 |
| Total | 433 | 100.00 | $3,365,887,433 | $1,070,490,502 | 31.84 |

Source: Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions? Table 12b (1996).

49.   Researchers affiliated with NERA updated the 1996 study in 1999.  The 1999 NERA update shows that fee awards in securities class actions continue to average around 30 percent of the common fund recovery when expenses are excluded.  Table 5 shows this in the bottom row. Again, the requested fee in the present case is reasonable by comparison:

### Table 5: Fee Awards in Settled Securities Class Actions 1991-1999: NERA Data

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | Jun-99 | 1991 to Jun-1999 |
|---|---|---|---|---|---|---|---|---|---|---|
| Number of Settlements | 48 | 79 | 90 | 101 | 104 | 104 | 98 | 80 | 29 | 733 |
| Average Settlement (millions) | $6.3 | $9.9 | $8.3 | $6.1 | $10.7 | $7.0 | $7.9 | $11.0 | $6.0 | $8.3 |
| Total Value of Settlements (millions) | $304.8 | $778.5 | $749.1 | $615.9 | $1,108.7 | $722.9 | $769.8 | $876.3 | $174.2 | $6,100.2 |
| Median Settlement (millions | $3.7 | $5.0 | $4.4 | $3.6 | $4.8 | $4.1 | $3.2 | $5.8 | $4.3 | $4.2 |
| Average Plaintiffs' Attorney Fees (millions) | $2.1 | $2.7 | $2.0 | $2.0 | $3.5 | $2.2 | $2.5 | $3.4 | $2.0 | $2.5 |
| Average Plaintiffs' Attorney Fees as a Percentage of Average Settlement | 33% | 27% | 24% | 34% | 33% | 31% | 32% | 31% | 33% | 30% |

Source: Todd S. Foster, Denise N. Martin, Vinita M. Juneja, Frederick C. Dunbar, Trends in Securities Litigation and the Impact of PSLRA, Figure 12 (June 1999).

50.   The Federal Judicial Center has also examined the issue of class action attorneys' fees.  A 1996 study examined all class actions (*i.e.,* not just securities cases) terminated between July 1, 1992, and June 30, 1994, in four federal district courts.  Thomas E. Willging, et al., *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 4 (1996). Median fee awards ranged from 27% to 30%, and most awards were between 20% and 40% of the monetary settlement. The following figure summarizes the data:

22

**Figure 72: Mean and Median Fee-Recovery Rates in Certified Cases Using Percentage of Recovery Method and Providing Net Monetary Distribution to Class**



*Note:* "Net monetary distribution" is net of attorneys' fees and administrative expenses.
Source: Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 151 (1996).

The findings confirm that fee awards typically cluster around 30 percent for attorneys' fees in all types of litigation in the four federal district courts. The fee sought in the present case, 16.48% of full utilization value and 29.95% of projected utilization value, is reasonable in comparison.

51. A 2004 empirical study on attorney fees in class action settlements by Eisenberg and Miller examined data from another study that first appeared in the March-April 2003 edition of *Class Action Reports* (CAR) which compiled fees awards on 1,120 common fund cases. Theodore Eisenberg and Geoffrey Miller, *Attorneys' Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 27 (2004). Using the CAR data, the study concluded that the mean fee award for all 630 class action awards examined in common fund cases was 27% and the median fee award was 30%. Table 6 summarizes this data.

23

**Table 6:  Fee-Award Percent Summary by Case Category**

| Category | Common Fund Cases | | | |
|---|---|---|---|---|
| | Mean | Median | Std. Dev. | Number |
| Class Action Reports Data (CAR), 1993–2002 | | | | |
| Antitrust | 26.8 | 28.4 | 7.1 | 31 |
| Consumer | 24.3 | 25.0 | 8.5 | 48 |
| Civil rights | 23.5 | 25.5 | 11.0 | 4 |
| Derivative | 33.3 | 33.3 | — | 1 |
| Employment | 25.5 | 25.7 | 7.6 | 17 |
| Environmental | 30.5 | 30.5 | 7.8 | 2 |
| Government regulation | 29.7 | 29.7 | — | 1 |
| Labor/wage/pension | 22.9 | 26.4 | 10.6 | 30 |
| Mass tort | 17.6 | 17.0 | 6.9 | 8 |
| Securities | 27.9 | 30.0 | 7.4 | 483 |
| Taxpayer | 3.5 | 3.5 | — | 1 |
| Utilities | 20.3 | 20.3 | 1.7 | 2 |
| Social welfare/entitlements | 16.9 | 16.9 | 4.4 | 2 |
| Total | 27.0 | 30.0 | 7.9 | 630 |

Sources: Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 *Journal of Empirical Legal Studies* 51 (2004),  analyzing data from Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 *Class Action Rep.* 169 (2003).

52.  A recent study of all available class action settlements from 2006-2007 performed by Professor Brian Fitzpatrick of Vanderbilt University finds that the median and mean fees in the data he studied were approximately 25%.  Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 Journal of Empirical Legal Studies 811-846 (2010).

53.  A 2010 paper by Eisenberg and Miller studied all published class action settlements from 1993 to 2008 in both state and federal courts.  Theodore Eisenberg and Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 Journal of Empirical Legal Studies 248 (2010).  As shown in Table 7, the median attorneys' fee in the entire data set was 24% of the class recovery.

24

**Table 7:  Fee and Class Recoveries, by Locale, 1993-2008**

|  | Mean ratio | Median ratio | Mean fee | Median fee | Mean gross recovery | Median gross recovery | Number of cases |
|---|---|---|---|---|---|---|---|
| APPEAL | 0.19 | 0.20 | 5.89 | 2.15 | 57.86 | 13.37 | 25 |
| CDCA | 0.25 | 0.25 | 3.93 | 2.75 | 16.30 | 19.90 | 10 |
| DDC | 0.22 | 0.22 | 16.69 | 2.14 | 134.79 | 13.00 | 18 |
| DMA | 0.16 | 0.15 | 11.50 | 7.00 | 118.55 | 81.00 | 10 |
| DMN | 0.25 | 0.27 | 8.77 | 4.75 | 40.99 | 14.25 | 16 |
| DNJ | 0.21 | 0.22 | 32.26 | 7.80 | 503.42 | 36.88 | 35 |
| EDCA | 0.26 | 0.25 | 0.40 | 0.12 | 3.26 | 0.54 | 12 |
| EDLA | 0.26 | 0.23 | 7.79 | 1.77 | 43.53 | 8.61 | 13 |
| EDMI | 0.22 | 0.20 | 6.56 | 1.34 | 34.80 | 11.75 | 17 |
| EDNY | 0.32 | 0.25 | 11.33 | 2.38 | 142.42 | 9.03 | 26 |
| EDPA | 0.28 | 0.29 | 12.66 | 1.51 | 75.79 | 6.88 | 70 |
| MDFL | 0.21 | 0.21 | 3.64 | 2.66 | 18.23 | 14.87 | 12 |
| NDCA | 0.26 | 0.25 | 4.44 | 2.00 | 24.06 | 9.25 | 47 |
| NDIL | 0.24 | 0.24 | 12.14 | 2.75 | 51.45 | 12.50 | 29 |
| Other | 0.24 | 0.25 | 20.47 | 3.25 | 154.98 | 16.38 | 161 |
| SDCA | 0.26 | 0.25 | 4.66 | 1.14 | 63.12 | 4.90 | 10 |
| SDNY | 0.22 | 0.22 | 11.54 | 2.13 | 127.97 | 12.85 | 103 |
| State | 0.20 | 0.20 | 5.94 | 2.00 | 61.61 | 12.32 | 75 |
| Total | 0.23 | 0.24 | 12.84 | 2.33 | 116.01 | 12.50 | 689 |

Sources: Westlaw, LexisNexis, PACER.

The median fee in the Southern District of California was 25% of the recovery and the mean or average fee was 26%.  Judged by this study, the fee requested here is well within the range of reason.

    54.  Another important consideration bearing on the reasonable percentage fee is the risk of the case.  Risk is relevant because, within appropriate limits, it justifies a higher-than-normal fee in successful cases in order to compensate counsel for the cases that fail.

    55.  Empirical data confirm that risk is a relevant factor in class action attorneys' fees. Both of the Eisenberg and Miller papers mentioned above found that, holding other factors constant, risk was significantly and positively associated with fee awards: the more risk, the higher the fee.

25

56. This case presented unusually high risks. Plaintiff had to argue that the Defendant's representations were false, unfair or deceptive even though the Defendant claimed that there was nothing materially inaccurate in the policies or in the sales literature provided to class members. Similar arguments were rejected by a jury in the *Mooney* nationwide class action, in October 2009 (only months before the scheduled trial date in this action). *See supra.* Although finding Allianz to have made misrepresentations and/or engaged in deceptive practices, the jury also found that the *Mooney* plaintiffs and class were not harmed by those misrepresentations/ deceptive practices. *See*, Pl. Ex. 28, (*Mooney* jury verdict form).

Class certification was also particularly risky: a number of different annuity products were involved in this case, and they were sold in arguably different ways, by different selling agents with varying training and experience, to consumers who were differently positioned in terms of gender, age, health, and financial condition, and who possessed varying degrees of education and sophistication about financial planning and investment products. Perhaps the greatest risk of all was an exceptional vigor with which Allianz defended the case. Defendant was represented by capable attorneys who fought long and hard to protect their client's interests. In more than twenty years of involvement with class action litigation, I have never witnessed a more rigorous contest of class certification. Defendant vigorously resisted plaintiffs' motion to certify the class. When Defendant lost on this issue, it attempted to appeal the interlocutory order to the Ninth Circuit. Failing this, Defendant filed a motion to decertify the class. When this too was rejected, Defendant again sought leave to appeal. Defendant filed a motion to clarify the Court's certification order, a strategy which appears to have been an attempt to induce this Court to reconsider class certification issues, (particularly given their subsequent submission of the Court's order in this regard to supplement their then-pending petition for permission to

appeal before the Ninth Circuit).  Defendant next filed a motion to modify the class definition,

including seeking leave to once again brief an attack on certification issues relating to the

plaintiffs' crediting claims. Denial of this motion led to a third petition for permission to appeal

in the Ninth Circuit.  And Defendant was still not done.  When this strategy also failed,

Defendant attempted to decertify the punitive damages claim -- an effort which also failed.  In

short, Defendant lost no opportunity to fight class certification at every step, and refused to

concede until virtually every conceivable avenue had been exhausted.  These and other tactics by

Defendant contributed to the unusual protraction of this litigation: the typical consumer class

action of this type settles or is otherwise resolved with a year or two; this case, in contrast, settled

only after more than five years of intense litigation.

    57.  The presence of substantial risk in the present case is an additional reason for

awarding a suitably compensatory fee, and yet another basis for concluding that the fee of

between 16.48% (measured against the full utilization value of the benefits obtained for the

Class) and 29.95% (measured against the midpoint of the projected utilization value) of the

estimated class recovery is well within the range of reason.

<u>Litigation Expenses</u>

    58.  In addition to requesting an award of fees, counsel will request an award of costs and

expenses of up to $1.3 million.  A significant portion of this amount will ultimately be disbursed

to the class as additional direct class relief, pursuant to the terms of the Settlement Amendment,

rather than recovered by Class Counsel.  As a consequence, Plaintiffs are effectively requesting

an award in an amount less than their reported out-of-pocket costs and expenses, (approximately

$1.27 million).  Defendant has agreed not to oppose class counsel's application for an award of

costs and expenses up to $1.3 million.  This requested award is reasonable when judged by

awards in similar cases.

59.  Eisenberg and Miller's 2004 study found that for 232 cases from 1993 to 2002 for which cost data were available, mean costs were 2.8% of the recovery and median costs were 1.7%.  Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 51 (2004).  Median costs were 16.7% of the fee award and mean costs were 10.7% of the fee award. Eisenberg and Miller's 2010 study, which updated the data through 2008, found for 304 cases from 2003 to 2008, mean costs were 2.7% of the recovery and median costs remained at 1.7%.  Theodore Eisenberg and Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 Journal of Empirical Legal Studies 248-281 (2010).

60.  An award of $1.3 million in costs and expenses in the present case amounts to 7.2% of the requested $18.0 million fee, a reasonable sum when judged against the median of 16.7% and mean of 10.7% of the fee award reported in Eisenberg's and Miller's 2004 study.  This award represents just 1.2 % of the settlement's $109.2 million full utilization value, and 2.2% of the $60.1 million projected utilization value midpoint.  These percentages are well below the mean and median costs as a percentage of the recovery reported in the Eisenberg-Miller studies.

<u>Conclusion</u>

Based on awards in similar cases, it is my opinion that the requested fee of $18.0 million and requested expenses of $1.3 million are within the range of reason when judged against results in similar cases.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on February _8_ , 2011, in New York City, New York.

Geoffrey P. Miller

29

## Appendix A: Materials Reviewed

(1) Third Amended Class Action Complaint;

(2) Notice of Motion and Motion to Certify Case as Class Action; Memorandum of Points and Authorities in Support Thereof;

(3) Plaintiffs' Reply to Opposition to Motion to Certify Case as Class Action; Memorandum of Points and Authorities in Support Thereof;

(4) Order Granting Plaintiffs' Class Certification Pursuant to Fed.R.Civ.P.23;

(5) Defendant Allianz Life's Petition for Permission to Appeal from Decision Granting Class Certification;

(6) Allianz Life Insurance Company of North America's Petition for Rule 23(f) Appeal from the United States District Court for the Southern District of California;

(7) Letter from Denise A. Fee to Clerk, Ninth Circuit Court of Appeals dated August 20, 2008;

(8) Letter from Chris D. Edgington to Clerk, Court of Appeals for the Ninth Circuit, September 2, 2008;

(9) Plaintiffs' Answer in Opposition to Allianz's Rule 23(f) Petition for Permission to Appeal;

(10) Plaintiffs' Opposition to Motion to Decertify Class; Memorandum of Points and Authorities in Support Thereof; Declaration of Robert S. Gianelli;

(11) Order Denying Petition for Permission to Appeal the District Court's July 8, 2008 Order Denying Motion for Class Decertification;

(12) Defendant Allianz Life Insurance Company of North America's Notice of Motion and Motion for Summary Judgment;

(13) Defendant Allianz Life Insurance Company of North America's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment;

(14) Plaintiffs' Opposition to Defendant Allianz Life Insurance Company of North America's Motion for Summary Judgment; Memorandum of Points and Authorities in Support Thereof;

(15) Defendant Allianz Life Insurance Company of North America's Reply Memorandum of Points and Authorities in Support of its Motion for Summary Judgment;

(16) Order Granting Defendant's Motion to Exclude Newly Submitted Authorities, Granting in Part, Denying in Part Defendant's Motion for Summary Judgment, Removing Mr. Iorio as Representative Plaintiff from Certain Causes of Action, and Denying Defendant's Motion for Class Decertification;

(17) Defendant Allianz Life Insurance Company of North America's Memorandum of Points and Authorities in Support of its Motion to Modify the Class Definition, Establish Subclasses, and Adopt a Trial Plan;

(18) Order Denying Ex Parte Motion for Clarification of Prior Order;

(19) Order Denying Motion to Modify Class Definition, Establish Subclasses, and Adopt a Trial Plan;

(20) Order of Ninth Circuit Denying Petition for Permission to Appeal the District Court's February 23, 2009 Order Denying Petitioner's Motion to Modify the Class Definition;

(21) Defendant Allianz Life Insurance Company of North America's Memorandum of Points and Authorities in Support of Motion to Decertify Punitive Damages Class Claim;

(22) Plaintiffs' Opposition to Allianz's Motion to Decertify the Class Punitive Damages Claim;

(23) Defendant Allianz Life Insurance Company of North America's Reply in Support of Motion to Decertify Punitive Damages Class Claim;

(24) Order Denying Defendant's Motion to Decertify Punitive Damages Class Claim;

(25) Plaintiffs' Supplemental Brief re "Bonus Issue";

(26) Plaintiffs' Motion for Preliminary Approval of Proposed Class Action Settlement;

(27) Declaration of Christopher D. Edgington In Support of Motion for Preliminary Approval of Proposed Class Action Settlement, with exhibits;

(28) Transcript of preliminary settlement approval hearing, July 1, 2010;

(29) Settlement Stipulation;

(30) Notice of Proposed Class Action Settlement and Fairness Hearing;

(31) Declaration of Raymond E. Mattison In Support of Motion for Preliminary Approval of Proposed Class Action Settlement;

(32) Declaration of Ronald A. Marron in Support of Motion For Preliminary Approval of Proposed Class Action Settlement;

(33) Declaration of Robert S. Gianelli in Support of Motion For Preliminary Approval of Proposed Class Action Settlement;

(34) Joint Motion for Order Continuing Preliminary Approval Hearing and Date to File Preliminary Approval Pleadings;

(35) Order Preliminarily Approving Class Action Settlement, Directing Distribution of the Class Action Settlement Notice, Setting a Final Approval Hearing, and Preliminarily Enjoining Parallel Proceedings;

(36) Table 1: Class Counsel Lodestar;

(37)  Declaration of Vincent P. Gallagher, Ph.D., dated February 7, 2011;

(38) Amendment to Settlement Stipulation, executed January 6, 2011;

(39) Declaration of Gary Greenfield, dated February 8, 2011.

31

**Appendix B:  Resume**


**GEOFFREY P. MILLER**


New York University Law School
40 Washington Square South Suite 411G
New York, New York 10012
 (212) 998-6329 (office)
(212) 995-4659 (fax)
geoffrey.miller@nyu.edu

<u>Work Experience</u>

New York University Law School (1995-present)
  Stuyvesant P. Comfort Professor of Law
  Director, NYU Center for the Study of Central Banks and Financial Institutions (1994-present)
  Co-Director, NYU Center for Law, Economics and Organization (2006-present)
  Co-Founder and Co-President, Society for Empirical Legal Studies (2006-2007)
  Chair, Academic Personnel Committee (1999-2000; 2004-2006)
  Chair, Promotions and Tenure Committee (2007-2009)

University of Chicago Law School (1983-1995)
  Kirkland & Ellis Professor (1989-1995)
  Editor, Journal of Legal Studies (1989-1995)
  Director, Program in Law and Economics (1994-1995)
  Director, Legal Theory Workshop (1989-1993)
  Associate Dean (1987-1989)
  Professor of Law (1987-1989)
  Assistant Professor of Law (1983-1987)


Faculty Member, Study Center Gerzensee, Switzerland, Spring 2012 (invited)
Visiting Lecturer, University of Genoa Department of Law, Spring 2011 (invited)
Visiting Scholar, European University Institute, Florence Italy, Fall/Winter 2010
Visiting Chair on Private Actors and Globalisation, Hague Institute for the Internationalisation
        of Law, Fall/Winter 2010
Robert B. and Candace J. Haas Visiting Professor of Law, Harvard Law School,
        Fall 2009

32

Page 444

Max Schmidheiny Guest Professor, University of St. Gallen, Switzerland
    Summer 2009
Fresco Endowed Professor of Law, University of Genoa, Italy, Summer 2008,
    Spring 2009, Summer 2010
Visiting Scholar, University of Minnesota Law School, Spring 2008
Visiting Lecturer, University of Bolzano, Italy, Summer 2007
Commerzbank Visiting Professor, Institute for Law & Finance, University of
    Frankfurt, Germany, Summer 2004, Summer 2005, Summer 2010
Visiting Professor, Columbia Law School, Fall 2001
Visiting Professor, University of Sydney, Australia, Summer 2002; Summer 2006;
    Spring 2009
Zaeslin Visiting Professor, University of Basel, Switzerland, Summer 2001, 2002, 2003,
    2004, 2005, 2007, 2008, 2009, 2010, 2011 (invited)
Visiting Scholar, CentER for Economic Research, Tilburg, Holland, Summer 1996
John M. Olin Visiting Scholar, Cornell University Law School, Summer 1992,
    Spring 1996; Winter 1997, Summer 2005, Spring 2008, Spring 2009, Spring 2010
Visiting Scholar, Bank of Japan, Spring 1995
Visiting Professor, New York University Law School, Fall 1994
Consultant, Federal Reserve Bank of Chicago, 1992-1994
Visiting Scholar, New York University Law School, Fall 1993
Simpson Grierson Butler White Visiting Professor, University of Aukland,
    New Zealand, Summer 1993

Associate, Ennis, Friedman, Bersoff & Ewing
Washington, D.C. (1982-83)

Attorney Adviser, Office of Legal Counsel
U.S. Department of Justice (1980-82)

Clerk, Hon. Byron R. White
Supreme Court of the United States (1979-80)

Clerk, Hon. Carl McGowan
U.S. Court of Appeals, District of Columbia (1978-79)

<u>Corporate Service</u>

Member of the Board of Directors, State Farm Bank (2010) – board and committee service for
nontraditional thrift institution with $15 billion in assets.

<u>Education</u>

Columbia Law School, J.D. (1978)
Editor-in-Chief, Columbia Law Review (1977-78)
Princeton University, A.B. *magna cum laude* (1973)

33

Publications

Books

Ways of a King: Legal and Political Ideas in the Bible (manuscript 2011)

Trust, Risk, and Moral Hazard in Financial Markets (Il Mulino, 2011) (forthcoming)

The Origins of the Necessary and Proper Clause (with Gary Lawson, Robert Natelson, and Guy Seidman) (Cambridge University Press 2010)

The Economics of Ancient Law (editor) (Edward Elgar 2010)

Bank Mergers and Acquisitions (editor, with Yakov Amihud) (Kluwer Academic Publishers 1998)

La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin America and Their New Legal Structure] (in Spanish) (editor, with Ernesto Aguirre and Roberto Junguito Bonnet) (Tercer Mundo: Bogotá 1997)

Costly Policies: State Regulation and Antitrust Exemption in Insurance Markets (AEI Press 1993) (with Jonathan R. Macey)

Banking Law and Regulation, Little, Brown & Co. 1992 (with Jonathan R. Macey); Second Edition, Aspen Law & Business 1997 (with Jonathan R. Macey), Third Edition, Aspen Law & Business 2001 (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan R. Macey), under title "The Law of Banking and Financial Institutions"

Banking Law and Regulation: Statutory and Case Supplement (Little, Brown & Co. 1992; Second Edition, Aspen Law & Business, 1997) (with Jonathan R. Macey), Third Edition, Aspen Law & Business, 2000) (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan Macey)

Banking Law and Regulation: Teacher's Manual (1992; Second Edition 1997; Third Edition 2001, Fourth Edition 2008) (with Jonathan R. Macey and Richard Scott Carnell)

Articles

Legal Ethics/Legal Profession

The English vs. the American Rule on Attorneys Fees: An Empirical Study of Attorney Fee Clauses in Publicly-Held Companies' Contracts (manuscript 2010) (with Theodore Eisenberg)

Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248 (2010) (with Theodore Eisenberg)

34

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation 2007: Prosecution & Defense Strategies (2007)

From Club to Market: The Evolving Role of Business Lawyers, 74 Fordham Law Review 1105 (2005)

Bad Judges, 83 Texas Law Review 431 (2004)

Attorneys' Fees in Class Action Settlements: An Empirical Study, 1 Journal of Empirical Legal Studies 27 (2004) (with Theodore Eisenberg)

Professional Independence and the Corporate Lawyer (with William T. Allen), in Jay W. Lorsch, Leslie Berlowitz, and Andy Zelleke, Restoring Trust in American Business 113-126 (American Academy of Arts and Sciences 2005)

Conflicts of Interest in Class Action Litigation: An Inquiry into the Appropriate Standard, 2003 University of Chicago Legal Forum 581-630 (2003)

Payment of Expenses in Securities Class Actions: Ethical Dilemmas, Class Counsel, and Congressional Intent, 22 Review of Litigation 557 (2003)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation: Prosecution & Defense Strategies (2003)

Conflicts of Interest in Negotiation: An After-word and a Reply, 84 Iowa Law Review 1133-1139 (1999) (with Jonathan R. Macey)

Second Opinions in Litigation, 84 Virginia Law Review 1411-1437 (1998)(with Michael Klausner and Richard Painter)

Kaye, Scholer as Original Sin: The Lawyer's Duty of Candor and the Bar's Temptations of Evasions and Apology, 23 Law & Social Inquiry 305-313 (1998)

An Economic Analysis of Conflict of Interest Regulation, 82 Iowa Law Review 965-1005 (1997) (with Jonathan R. Macey), republished in Foundations of the Law and Ethics of Lawyering, George Meredith Cohen and Susan P Koniak, editors. New York: Foundation Press (2004)

Reflections on Professional Responsibility in a Regulatory State, 63 George Washington Law Review 1105 (1995) (with Jonathan R. Macey)

Government Lawyers' Ethics in a System of Checks and Balances, 54 University of Chicago Law Review 1293 (1987)

35

Page 447

<u>Civil Procedure</u>

Group Litigation in the Enforcement of Tort Law, in Jennifer Arlen, ed., The Economics of Torts (forthcoming 2011)
The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal, 63 Vanderbilt Law Review 107 (2010) (with Charles Silver)

Will Aggregate Litigation Come to Europe?, 62 Vanderbilt Law Review 177-210 (2009) (with Samuel Issacharoff)

Preliminary Judgments, 2010 University of Illinois Law Review 165 (2009)

A New Look at Judicial Impact:  Attorneys' Fees in Securities Class Actions after Goldberger v. Integrated Resources, Inc., 29 Washington University Journal of Law & Policy 5-35 (2009) (with Theodore Eisenberg and Michael Perino)

Punti cardine in tema di class action negli Stati Uniti e in Italia (Cutting-Edge Issues in U.S. and Italian Class Action Litigation), 2008 Analisi Giuridica dell'Economia 211-230 (2008)

Compensation and Deterrence in Consumer Class Actions in the United States, in Fabrizio Cafaggi and Hans W. Micklitz, eds., New Frontiers in Consumer Protection: The Interplay Between Private and Public Enforcement 263-282 (2009)

Pleading after *Tellabs*, 2009 Wisconsin Law Review 507-534 (2009)

Mandatory Arbitration for Customers But Not For Peers, 92 Judicature 118-123 (2009) (with Theodore Eisenberg and Emily Sherwin)

Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Non-Consumer Contracts, 41 University of Michigan Journal of Law Reform 871-96 (2008) (with Theodore Eisenberg and Emily Sherwin); reprinted in 7 ICFAI University Journal of Alternative Dispute Resolution (Hyderabad, India)

Reversal, Dissent, and Variability in State Supreme Courts: The Centrality of Jurisdictional Source, 89 Boston University Law Review 2009 (2009) (with Theodore Eisenberg)

All-or-Nothing Versus Proportionate Damages, 38 Journal of Legal Studies 345-382 (2009) (with Shmuel Leshem)

Judicial Review of Class Action Settlements, 1 Journal of Legal Analysis 167-205 (2008) (with Jonathan R. Macey)

Do Juries Add Value? Evidence From an Empirical Study of Jury Trial Waiver Clauses in Large Corporate Contracts, 4 Journal of Empirical Legal Studies 539 (2007) (with Theodore Eisenberg)

36

The Flight from Arbitration: An Empirical Study of *Ex Ante* Arbitration Clauses in Publicly-Held Companies' Contracts, 56 DePaul Law Review 335 (2007) (with Theodore Eisenberg), reprinted in 49 Corporate Practice Commentator323 (2007)

Rethinking Certification and Notice in Opt-Out Class Actions, 74 University of Missouri Kansas City Law Review 637 (2006)

Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA Law Review 1303 (2006) (with Theodore Eisenberg)

Review of the Merits in Class Action Certification, 33 Hofstra Law Review 51 (2004)

The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues, 57 Vanderbilt Law Review 1529 (2004) (with Theodore Eisenberg)

Competing Bids in Class Action Settlements, 31 Hofstra Law Review 633-650 (2003)

On the Costs of Civil Justice, 80 University of Texas Law Review 2115 (2002)

Class Actions in the Gulf States: Empirical Analysis of a Cultural Stereotype, 74 Tulane Law Review 681 (2000)

Full Faith and Credit to Settlements in Overlapping Class Actions: A Reply to Kahan and Silberman, 73 New York University Law Review 1167-1178 (1998)

Nonpecuniary Class Action Settlements, 60 Law and Contemporary Problems 97-155 (1997) (with Lori Singer)

Class Actions, in I New Palgrave Dictionary of Economics and the Law 257-262 (Peter Newman, ed., Macmillan Press 1998)

The Legal-Economic Analysis of Comparative Civil Procedure, 45 American Journal of Comparative Law 905-19 (1997)

Overlapping Class Actions, 71 New York University Law Review 514 (1996)

Settlement of Litigation: A Critical Retrospective, in Larry Kramer, ed., Reforming the Civil Justice System 13-37 (NYU Press 1996)

Expanding on the Fifty Percent Hypothesis: A Multimodal Approach to the Selection of Cases for Litigation, 25 Journal of Legal Studies 233 (1996) (with Daniel Kessler and Thomas Meites)

A Market Approach to Tort Reform Via Rule 23, 80 Cornell Law Review 909 (1995) (with Jonathan R. Macey)

Settlement Escrows, 24 Journal of Legal Studies 87 (1994) (with Robert Gertner)

37

Introduction: Economic Analysis of Civil Procedure, 23 Journal of Legal Studies 303 (1994)

Auctioning Class Action and Derivative Suits: A Rejoinder, 87 Northwestern Law Review 701 (1992) (with Jonathan R. Macey)

The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 University of Chicago Law Review 1 (1991) (with Jonathan R. Macey), reprinted in Franklin A. Gevurtz, Corporate Law Anthology 186-194 (1997)

Some Thoughts on the Equilibrium Hypothesis, 69 Boston University Law Review 561 (1989)

Some Agency Problems in Settlement, 16 Journal of Legal Studies 189 (1987)

An Economic Analysis of Rule 68, 15 Journal of Legal Studies 93 (1986)

The Public Interest in Attorneys' Fees Awards for Public Interest Litigation, 47 Law and Contemporary Problems 233 (1984) (with Robert V. Percival), reprinted in University of Chicago Law School Record (1989)

Note, Aldinger v. Howard and Pendent Jurisdiction, 77 Columbia Law Review 127 (1977)

<u>Corporate, Contract and Securities Law</u>

A Modest Proposal for Fixing Delaware's Broken Duty of Care, 2010 Columbia Business Law Review 319 (2010)

Un-manifested Harm in Business-to-Business Cases, __ Journal of Theoretical and Institutional Economics __ (forthcoming)

Process as Currency with the Courts: Judicial Scrutiny of Directors' Decisions, 1 International Journal of Corporate Governance 337-365 (2010) (with Jonathan R. Macey)

A Simple Theory of Takeover Regulation in the United States and Europe, 42 Cornell International Law Journal 301 (2009) (with Guido Ferrarini), reprinted in 55 Rivista Delle Societá 680 (2010)

Bargains Bicoastal: New Light on Contract Theory, 31 Cardozo Law Review 1475 (2010)

Flight to New York: an Empirical Analysis of Choice of Law and Forum Selection Clauses in Large Commercial Contracts, 30 Cardozo Law Review 1475 (2009) (with Theodore Eisenberg)

The Market for Contracts, 30 Cardozo Law Review 2073 (2009) (with Theodore Eisenberg)

Ex Ante Choices of Law and Forum: An Empirical Analysis of Corporate Merger Agreements, 59 Vanderbilt Law Review 1975 (2006) (with Theodore Eisenberg)

Catastrophic Failures: Enron and Beyond, 89 Cornell Law Review 423-455 (2004)

Capital Markets on the Internet: An Introduction, 5 New York University Journal of Legislation and Public Policy 1 (2001-2002)

Das Kapital: Solvency Regulation of the American Business Enterprise, in Eric Posner, ed., Chicago Lectures in Law and Economics 65-81 (2000)

Takeovers: English and American, 6 European Financial Management 533-542 (2000)

Choice of Law as a Pre-Commitment Device, in F.H. Buckley, ed., The Fall and Rise of Freedom of Contract 357-69 (Duke University Press 1998)

On the Advantages of Defined Contribution Plans, in Samuel Estreicher, ed., Proceedings of the 50th Annual Conference on Labor (Kluwer Academic Press, forthcoming 1998)

Political Structure and Corporate Governance: Some Points of Contrast Between the U.S. and the U.K., 1998 Columbia Business Law Review 51-78 (1998), reprinted in Sloan Project on Corporate Governance at Columbia Law School, Corporate Governance Today 629-648 (1998)

Finance and the Firm, 152 Journal of Institutional and Theoretical Economics [Zeitschrift fur die Gesamte Staatswissenschaft] 89-107 (1996)

Corporate Governance and Commercial Banking: A Comparative Examination of Germany, Japan and the United States, 48 Stanford Law Review 73 (1995) (with Jonathan R. Macey)

Comment on "Brokerage, Market Fragmentation, and Securities Market Regulation," in Andrew W. Lo, ed., The Industrial Organization and Regulation of the Securities Industry, University of Chicago Press (1996)

Corporate Stakeholders: A Contractual Perspective, 43 University of Toronto Law Review 401 (1993) (with Jonathan R. Macey)

The Culture of Capital: Comments on Conley and O'Barr, 71 North Carolina Law Review 201 (1992)

The Economic Efficiency of Close Corporation Law: A Comment, 70 Washington University Law Quarterly 399 (1992)

Lessons from Financial Economics: Materiality, Reliance, and the Utility of Empirical Methodology in Extending the Reach of Basic v. Levinson, 77 Virginia Law Review 1015 (1991) (with Jonathan R. Macey, Jeffrey Netter, and Mark Mitchell)

The Fraud on the Market System Revisited, 77 Virginia Law Review 999 (1991) (with Jonathan R. Macey)

Politics, Bureaucracies, and Financial Markets: Bank Entry into Commercial Paper Underwriting in the United States and Japan, 139 University of Pennsylvania Law Review 369-453 (1990) (with David Litt, Jonathan R. Macey, and Edward L. Rubin)

Good Finance, Bad Economics: An Analysis of the Fraud on the Market Theory, 42 Stanford Law Review 1059 (1990) (with Jonathan R. Macey)

Trans-Union Reconsidered, 98 Yale Law Journal 127 (1988)(with Jonathan R. Macey)

Toward an Interest Group Theory of Delaware Corporate Law, 65 Texas Law Review 469 (1987) (with Jonathan R. Macey)

Constitutional Law

The President's Power of Interpretation: Implications of a Unified Theory of Constitutional Law, 56 Law and Contemporary Problems 35 (1993)

The Unitary Executive in a Unified Theory of Constitutional Law: The Problem of Interpretation, 15 Cardozo Law Review 201 (1993)

Liberty and Constitutional Architecture: The Rights-Structure Paradigm, 16 Harvard Journal of Law & Public Policy 87 (1993)

Rights and Structure in Constitutional Theory, 8 Social Philosophy & Policy 196 (1991), reprinted in E. Frankel Paul, ed., Reassessing Civil Rights (1991)

The Appropriations Power and the Necessary and Proper Clause, 68 Washington University Law Quarterly 640 (1990) (panel)

From Compromise to Confrontation: Separation of Powers in the Reagan Era, 57 George Washington Law Review 401 (1989)

Rediscovering Economic Liberties, 41 Rutgers Law Review 773 (1989) (panel)

War Powers and the Constitution: A Middle Ground, 43 University of Miami Law Review 35 (1988) (panel)

The Debate Over Independent Agencies in Light of the Empirical Evidence, 1988 Duke Law Journal 215 (1988)

Independent Agencies, 1986 Supreme Court Review 41 (1986)

40

<u>Financial Institutions</u>

Financial Private Regulation and Enforcement (manuscript, 2010)

Intellectual Hazard and the Design of Financial Stability Regulation, in University of St. Gallen Series in Law and Economics, Peter Nobel, ed. (Zurich: Schulthess, 2010) (with Gerald Rosenfeld)

Intellectual Hazard: How Conceptual Biases in Complex Organizations Contributed to the Crisis of 2008, 33 Harvard Journal of Law & Public Policy 807 (2010) (with Gerald Rosenfeld)

Helping Law Catch Up to Markets: Applying Broker-Dealer Law to Subprime Mortgages, 34 Journal of Corporation Law 789 (2009) (with Jonathan Macey, Maureen O'Hara and Gabriel D. Rosenberg)

The Basel Committee, Global Administrative Law, and the Developing World, in Benedict Kingsbury and Richard Stewart, eds, India, the South and the Shaping of Global Administrative Law  (forthcoming, Oxford University Press India 2008) (with Michael Barr)

Comment: Credit Risk Transfer, Hedge Funds, and the Supply of Liquidity, in Peter Nobel and Marina Gets, eds., Law and Economics of Risk in Finance, University of St. Gallen Series in Law and Economics 73 (2008)

Global Administrative Law – The View from Basel, 17 European Journal of International Law 15 (2006) (with Michael Barr)

Three Myths about Central Banks, Federal Reserve Bank of Cleveland Economic Commentary (November 2002)

Central Bank Independence in Ordinary and Extraordinary Times, in Jan Kleiniman, ed., Central Bank Independence: the Economic Foundations, the Constitutional Implications, and Democratic Accountability (Kluwer Academic Press 2000) 31-51 (with Rosa Lastra)

External Review of Central Bank Decisions, in 1 International Monetary Fund,  Current Developments in Monetary and Financial Law 535-51 (1999)

Bank Mergers and American Bank Competitiveness, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions 175-190 (Kluwer Academic Publishers, 1998) (with Jonathan R. Macey)

Introduction: Bank Mergers and Acquisitions, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions vii-xiii (Kluwer Academic Publishers, 1998)

Deposit Insurance for Economies in Transition, in Kluwers Yearbook of International and Financial Law 103-138 (1997) and R. Lastra and H. Schiffman, eds., Bank Failures and Bank Insolvency Law in Economies in Transition 37-70 (Kluwers Academic Press 1998)

Central Bank Independence, Liberalization and Inflation in Transition Economies: An International Perspective, 49 Journal of Monetary Economics 237 (2002) (with Alex Cukierman and Bilin Neyapti)

An Interest-Group Theory of Central Bank Independence, 27 Journal of Legal Studies 433-453 (June 1998)

On the Obsolescence of Commercial Banking, 154 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 61-73 (1998)

Banking Crises in Perspective: Two Causes and One Cure, in Gerard Caprio, Jr, William C. Hunter, George G. Kaufman, and Danny M. Leipziger, eds., Preventing Banking Crises: Lessons from Recent Global Bank Failures 279-287 (Federal Reserve Bank of Chicago, 1998)

Universal Banks are Not the Answer to America's Corporate Governance "Problem": A Look at Germany, Japan, and the U.S., 9 Journal of Applied Corporate Finance 57-73 (1997)(with Jonathan R. Macey), republished in The Revolution in Corporate Finance, Joel M Stern and David H. Chew, editors, Marlden, MA: Blackwell (2003)

Cooperation, Conflict, and Convergence in Japanese Finance: Evidence from the "Jusen" Problem, 29 Law and Policy in International Business 1-78 (1998)(pre-published as Washington University School of Law, Working Paper No. 97-3-1) (with Curtis Milhaupt)

Nihon no kin'yu ni okeru jusenmondai hoteki bunsekito keizaiteki bunseki [The Jusen Problem in Japanese Finance: A Legal and Economic Analysis], 1132 Jurisuto 140-49; 1134 Jurisuto 86-92; 1136 Jurisuto 83-89 (1998) (with Curtis Milhaupt) (in Japanese)

A Regulatory Cartel Model of Decisionmaking in Japanese Finance, 4 Zeitschrift fur Japanisches Recht 18-29 (1997)(with Curtis Milhaupt)

Banco de Fondos Mutuos Para América Latina? [Mutual Fund Banking for Latin America?], in La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin America and Their New Legal Structure], Ernesto Aguirre, Roberto Junguito Bonnet, and Geoffrey Miller, eds. 272-280 (1997) (in Spanish)

The Role of a Central Bank in A Bubble Economy, 18 Cardozo Law Review 1053 (1996)

Decisionmaking at the Bank of Japan, 28 Law and Policy in International Business 1 (1996)

Is Deposit Insurance Inevitable? Lessons From Argentina, 16 International Review of Law and Economics 211 (1996), reprinted in Jagdeep Bandhari and Alan Sykes, eds., Economic Dimensions in International Law: Comparative and Empirical Perspectives 392-404 (Cambridge University Press, 1998)

El Papel del Banco Central en una Economia Especulativa [The Role of a Central Bank in a Speculative Economy], in Miguel Mancera Aguayo, ed., El Banco de México en la Reconstrucción Económica Nacional 137 (Centro Cultural Manuel Gómez Morin, A.C., 1996)

Comments on Rajan and James, in A. Saunders & I. Walter, eds., Universal Banking: Financial System Design Reconsidered 330-333 (Irwin & Co. 1996)

Deposit Insurance, the Regulatory Contract, and the Mismatch in the Term Structure of Banks' Assets and Liabilities, 12 Yale Journal on Regulation 1-50 (1995)(with Jonathan R. Macey), reprinted as L'Assurance Des Depots, Le Contrat Reglementaire Implicite, et la Destruction des Eschances des Actifs et Passifs Bancaires, 6 Journal des Economistes et des Etudes Humaines 531 (1995)

Double Liability of Bank Shareholders: A Look at the New Data, 28 Wake Forest Law Review 933 (1993) (with Jonathan R. Macey)

Politics of Deposit Insurance Reform: The Case of Argentina, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 473 (1993) and 1 University of Chicago Law School Roundtable 129 (1994), republished as "Políticas de Reforma de Seguro de Depósito. El Caso de la Argentina," in Revista de Derecho Bancario y de la Actividad Financiera, Año 4, Enero-diciembre 1994, No. 19/24, at 221-239 (1995) (Argentine journal)

Comment on Universal Banks and Financial Stability, 19 Brooklyn International Law Journal 197 (1993)

Kaye, Scholar, FIRREA and the Desirability of Early Closure: A View of the Kaye, Scholar Case from the Perspective of Bank Regulatory Policy, 66 University of Southern California Law Review 1115 (1993) (with Jonathan R. Macey)

Constitutional Moments, Pre-commitment, and Fundamental Reform: The Case of Argentina, 71 Washington University Law Quarterly 1061 (1993)

Legal Restrictions on Bank Consolidation: An Economic Analysis, 77 Iowa Law Review 1083 (1992)

The Community Reinvestment Act: An Economic Analysis, 79 Virginia Law Review 291 (1993) (with Jonathan R. Macey)

Drunken Sailors on a Sinking Ship? The Rehnquist Court and the Bank Failure Problem, 1993 Public Interest Law Review 83 (1993)

Comments on Calomiris, in M. Klausner & L. White, eds., Structural Change in Banking 212 (1993)

The McCarran-Ferguson Act: A Case Study of Regulatory Federalism, 68 New York University Law Review 13 (1993), republished in 7 National Insurance Law Review 521 (1995)(with

43

Jonathan R. Macey)(study prepared originally under the auspices of the American Enterprise Institute's Project on Federalism)

Bank Failure: The Politicization of a Social Problem, 45 Stanford Law Review 289 (1992) (with Jonathan R. Macey)

Toward Enhanced Consumer Choice in Banking: Uninsured Depository Facilities as Financial Intermediaries for the 1990s, 1991 N.Y.U. Annual Survey of American Law 865 (1992) (with Jonathan R. Macey)

Nondeposit Deposits and the Future of Bank Regulation, 91 Michigan Law Review 237-273(1992) (with Jonathan R. Macey)

America's Banking System: The Origins and Future of the Current Crisis, 69 Washington University Law Quarterly 769 (1991) (with Jonathan R. Macey)

Bank Failures, Risk Monitoring, and the Market for Corporate Control (with Jonathan R. Macey), 88 Columbia Law Review 1153 (1988) (study conducted under the auspices of the Administrative Conference of the United States)

The Future of the Dual Banking System, 53 Brooklyn Law Review 1 (1987)

Public Policy Implications of Legislation Limiting the Growth of Interstate Banks, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 602 (1986)

Interstate Branching and the Constitution, 41 Business Lawyer 337 (1986)

Interstate Banking in the Court, 1985 Supreme Court Review 179 (1985)

<u>Legal History</u>

The Common Law Origins of the Necessary and Proper Clause, 79 George Washington University Law Review 1 (2010)

*Meinhard v. Salmon,* in Jonathan R. Macey, ed., Corporate Law Stories (2008)

The Industrial Organization of Political Production: A Case Study, 149 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 769 (1993)

Comments on Priest, 36 Journal of Law and Economics 325 (1993)

Toward "Neutral Principles" in the Law: Selections from the Oral History of Herbert Wechsler, 93 Columbia Law Review 854 (1993) (with Norman Silber)

Double Liability of Bank Shareholders: History and Implications, 27 Wake Forest Law Review 31 (1992) (with Jonathan R. Macey)

Origin of the Blue Sky Laws, 70 Texas Law Review 347 (1991) (with Jonathan R. Macey), reprinted in 34 Corporate Practice Commentator 223 (1992)

Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine, 77 California Law Review 83 (1989)

The True Story of Carolene Products, 1987 Supreme Court Review 397 (1987), reprinted in Michael J. Glennon, et al., eds., Constitutional Law Anthology (Anderson Publishing 1997), pp. 94-103; reprinted in J. Ely, Property Rights in American History: Reform and Regulation of Property Rights (Garland Publishing 1997), pp. 165-197.

Interviewer, Columbia University Oral History Collection, Life of Herbert Wechsler (1980-1982) (with Norman Silber)

Jurisprudence

The Case of the Speluncean Explorers: Contemporary Proceedings, 61 George Washington Law Review 1798 (1993)

The End of History and the New World Order: The Triumph of Capitalism and the Competition Between Liberalism and Democracy, 25 Cornell International Law Journal 277 (1992) (with Jonathan R. Macey)

The Canons of Statutory Construction and Judicial Preferences, 45 Vanderbilt Law Review 647 (1992) (with Jonathan R. Macey)

Pragmatics and the Maxims of Interpretation, 1990 Wisconsin Law Review 1179 (1990)

Economic Efficiency and the Lockean Proviso, 10 Harvard Journal of Law and Public Policy 401 (1987)

Ancient Law

Logos and Narrative, NYU School of Law, Public Law Research Paper No. 10-78 (2010)

Monarchy in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-76 (2010)

Nationhood and Law in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-57 (2010)

Revelation and Legitimacy in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-52 (2010)

The Book of Judges: The Hebrew Bible's Federalist Papers, NYU School of Law, Public Law Research Paper No. 10-66 (2010)

Consent of the Governed in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-56 (2010)

Nomadism, Dependency, Slavery and Nationhood: Comparative Politics in the Book of Exodus, NYU School of Law, Public Law Research Paper No. 10-49 (2010)

Economics of Ancient Law, in Geoffrey P. Miller, ed., The Economics of Ancient Law (Edward Elgar, forthcoming 2010)

Patriarchy: The Political Theory of Family Authority in the Book of Genesis (manuscript 2010)

The Dark Age:  How the Biblical Narratives Demonstrate the Necessity for Law and Government (NYU School of Law, Public Law Research Paper No. 10-18)

Origin of Obligation: Genesis 2:4b-3:24 (NYU School of Law, Public Law Research Paper No. 09-60)

Sovereignty and Conquest in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-61 (2010)

Golden Calves, Stone Tablets, and Fundamental Law: A Political Interpretation of Exodus 32 (NYU School of Law, Public Law Research Paper No. 10-02)

A Riposte Form in the Song of Deborah, in Tikva Frymer-Kensky, Bernard Levinson and Victor Matthews, eds., Gender and Law in the Hebrew Bible and the Ancient Near East  113-27 (1998)

Foreword: The Development of Ancient Near Eastern Law, 70 Chicago-Kent Law Review 1623 (1996)

Why Ancient Law?, 70 Chicago-Kent Law Review 1465 (1995)(with James Lindgrin and Laurent Mayali)

Foreword: Land Law in Ancient Times, 71 Chicago-Kent Law Review 233 (1996)

The Song of Deborah: A Legal-Economic Analysis, 144 University of Pennsylvania Law Review 2293 (1996)

The Legal-Economic Approach to Biblical Interpretation, 150 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 755 (1994)

J as Constitutionalist: A Legal-Economic Interpretation of Exodus 17:8-16 and Related Texts, 70 Chicago-Kent Law Review 1829 (1995)

Verbal Feud in the Hebrew Bible: Judges 3:12-30 and 19-21, 55 Journal of Near Eastern Studies 105 (1995)

Contracts of Genesis, 22 Journal of Legal Studies 15-45 (1993)

Ritual and Regulation: A Legal-Economic Analysis of Selected Biblical Texts, 22 Journal of Legal Studies 477 (1993)

<u>Law and Society</u>

Parental Bonding and the Design of Child Support Obligations, in William S. Comanor, ed., The Law and Economics of Child Support Payments 210-240 (Edward Elgar 2004)

The Legal Function of Ritual, 80 Chicago-Kent Law Review 1181 (2005)

Handicapped Parking, 29 Hofstra Law Review 81 (2000) (with Lori S. Singer)

Custody and Couvade: The Importance of Paternal Bonding in the Law of Family Relations, 33 Indiana Law Review 691 (2000)

Norm Enforcement in the Public Sphere: The Case of Handicapped Parking, 71 George Washington Law Review 895-933 (2004)

Norms and Interests, 32 Hofstra Law Review 637 (2003)

Female Genital Mutilation: A Cultural-Legal Analysis (manuscript)

Circumcision: A Legal-Cultural Analysis, 9 Virginia Journal of Social Policy and the Law 498-585 (2002), pre-published as New York University Public Law and Legal Theory Working Paper Series, Working Paper 5 (2000)

Law, Pollution, and the Management of Social Anxiety, 7 Michigan Women's Law Journal 221-289 (2001)

<u>Other</u>:

Richard Posner, 61 N.Y.U. Annual Survey of American Law 13 (2004)

Introduction: The Law and Economics of Risk, 19 Journal of Legal Studies 531 (1990) (with Richard A. Epstein)

Law School Curriculum: A Reply to Kennedy, 14 Seton Hall Law Review 1077 (1984) (under pen name of Chris Langdell)

47

## Book Reviews

Defusing the Banks' Financial Time Bomb, BusinessWeek (Mar. 11, 2010) (review of Robert Pozen, Too Big to Save? How to Fix the U.S. Financial System

Love & Joy: Law, Language and Religion in Ancient Israel, by Yochanan Muffs, 58 Journal of Near Eastern Studies 144-45 (1999)

Jesus and the Jews: The Pharisaic Tradition in John; The Trial Of Jesus; Jesus And The Law, by Alan Watson, 1 Edinburgh Law Review 273 (1997)

No Contest: Corporate Lawyers and the Perversion of Justice in America, by Ralph Nader and Wesley J. Smith, Washington Post (October 13, 1996)

The Rise and Fall of the Classical Corporation: Hovenkamp's Enterprise and American Law: 1836-1937, 59 University of Chicago Law Review 1677 (1993)

Property Rights and the Constitution: A Review of James W. Ely, Jr.'s The Guardian of Every Other Right, 37 American Journal of Legal History 378 (1993)

Anatomy of A Disaster: Why Bank Regulation Failed, 86 Northwestern University Law Review 742 (1992)

The Glittering Eye of Law, 84 Michigan Law Review 1901 (1986)

A Rhetoric of Law, 52 University of Chicago Law Review 247 (1985)

## Major Lectures

Trust, Risk, and Moral Hazard in Financial Markets (University of Genoa, Fresco Chair Lectures in Law and Finance, June 2010)

A Simple Theory of Takeover Regulation in the United States and Europe; Intellectual Hazard (Commerzebank Lectures, University of Frankfurt, May 2010)

The European Union's Takeover Directive and Its Implementation in Italy (University of Rome III, 2008)

Catastrophic Financial Failures: Enron, HIH and More (Ross Parsons Lecture, Sydney, Australia, 2002)

Das Kapital: Solvency Regulation of the American Business Enterprise (Coase Lecture, University of Chicago Law School, 1993)

Banking in the Theory of Finance; The Simple Economics of Litigation and Settlement; The Economic Structure of Corporation Law (University of Auckland, New Zealand, 1993)

<u>Journal Referee Reports</u>

American Law and Economics Review
Journal of Legal Studies
Journal of Law, Economics and Organization
Review of Law and Economics

<u>Conferences Organized</u>

Judicial Dialogue on Mass Litigation, Florence Italy, October 15-16, 2010 (co-organizer of conference co-sponsored by NYU Law School, the American Law Institute, and the European University Institute)

Finlawmetrics 2010: Central Banking, Regulation & Supervision after the Financial Crisis (co-sponsor and member of steering committee)

Finlawmetrics 2009: After The Big Bang: Reshaping Central Banking, Regulation and Supervision (Milan, Italy, Spring 2009) (co-sponsor and member of steering committee)

NYU Global Economic Policy Forum 2009: The Future of Regulation and Capital Markets (November 5, 2009) (co-organized with Professor Alan Rechtschaffen and with the NYU Law School Alumni Association)

Third Annual Conference on Empirical Legal Studies (Cornell University, Ithaca, New York, Fall 2008) (co-organizer)

NYU Global Economic Policy Forum (April 14, 2007).  Major conference on economic policy. Keynote address by Jean Claude Trichet, President of the European Central Bank; presentations by Tevi Troy, Deputy Secretary of the Department of Health and Human Services; Kevin Warsh, Member of the Board of Governors of the Federal Reserve System; and Donald B. Marron, Jr., Senior Economic Advisor, President's Council of Economic Advisors.  Co-organized with Professor Alan Rechtschaffen.

Second Annual Conference on Empirical Legal Studies (New York, New York, November 10-11, 2007).  Major conference (425 participants) exploring all aspects of the empirical study of law.  Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

NYU Global Economic Policy Forum (April 11, 2007).  Major conference on economic policy. Keynote address by Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve System; presentations by Stanley Druckenmiller, Founder of Dusquesne Capital, Tevi Troy, Domestic Policy Advisor for President George W. Bush, and Jeffrey Rosen, Vice Chair of Lazard.  Co-organized with Professor Alan Rechtschaffen.

49

First Annual Conference on Empirical Legal Studies (Austin, Texas, October 2006).  Major conference exploring all aspects of the empirical study of law.  Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

Conference on Legal Aspects of the International Activities of Central Banks, Lima Peru, October 1997.  This conference, co-sponsored by the central bank of Peru, brought together leaders in the legal and economic issues facing central banks in the management of their external reserves.

Conference on the Governance of Institutional Investors (New York, New York, February 14, 1997). This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School Center for the Study of Central Banks, brought together top executives, attorneys, scholars and others interested in the management and organization, both economic and legal, of the nation's large institutional investors, including its mutual fund industry.

Conference on Bank Mergers and Acquisitions (New York, New York, October 11, 1996).  This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School's Center for the Study of Central Banks, brought together leading academics, lawyers, and investment bankers to discuss some of the broader implications of bank mergers and acquisitions.  Co-organizer of this conference was Professor Yakov Amihud of the Stern School's Finance Department.

Conference in Central Banks in Latin America (Bogota, Colombia, February, 1996).  This conference, co-sponsored by the central bank of Colombia with technical assistance from the Legal Affairs Department of the International Monetary Fund, brought together leaders of Latin American central banks, the international financial community, and scholars from a variety of disciplines, to discuss issues related to the independence of central banks and economic development.

Conference on Central Banks in Asia (Shanghai, China, October, 1995).  This conference, co-sponsored with KPMG-Peat Marwick, brought together leaders from commercial banks, investment banks, and industrial firms, as well as central bankers, to discuss Asian central banks to address issues such as the proposed law granting a degree of independence to the central bank of China.

Conference on Ancient Law (Berkeley, California, March 1995).  This conference, organized with Professors James Lindgren of Chicago-Kent Law School and Laurent Mayali of the University of California at Berkeley Law School, brought together important figures from a variety of disciplines interested in Ancient Law.  The proceedings are being published as two special issues of the Chicago-Kent Law Review, and as a book published by the Robbins Collection, Berkeley, California.

Conference on Central Banks in Eastern Europe and the Newly Independent States (Chicago, Illinois, April 1994).  This conference brought together the Prime Minister of Estonia, three present or former Ministers of Finance of Eastern European states (including Boris Fyoderov,

former Finance Minister of the Russian Republic), the heads of the central banks of eleven nations in Eastern Europe and the Newly Independent States, together with a wide variety of highly-placed officials from these countries and from the west, to discuss issues related to the independence of central banks and economic development.

## Professional Memberships and Positions

New York State Bar
District of Columbia Bar
American Bar Association
American Law Institute (1988-1996)
Member, Paolo Baffi Centre Scientific Advisory Board, Milan, Italy (2008- present)
Member, International Academic Council, University of St. Gallen,
    Switzerland (2004-present)
Chairman, Section on Business Associations, American Association of Law
    Schools (1995)
Member of the Board of Directors, American Law and Economics Association
    (1995-1998)
Member of the Foreign Advisory Committee, Latin American Law and
    Economics Association (1995-2000)
Member of the Foreign Advisory Board, Universitad Tocurato Di Tella School of Law,
    Buenos Aires, Argentina (1992-1999)
Member of the Editorial Board, Supreme Court Economic Review
Member of the Editorial Board, The Independent Review
Member of the Advisory Board, Yearbook of International Financial and
    Economic Law
Member of the Advisory Board, University of Hong Kong Faculty of Law Asian Institute
    of International Financial Law (2001-present)
Member of the Advisory Board, LSN Comparative Law Abstracts

## Courses

Legal Profession (1985-93; 1996-98; 2003-2007)
The Crisis of 2008 (2009, 2010)
Reading Class: Restructuring Finance (2009)
Property (1986-87)
Corporations (1985-88; 1991-93; 1997-2000; 2005; 2008)
Seminar on Separation of Powers (1985, 1987)
Civil Procedure (1983-84; 2004-2005)
Federal Regulation of Banking (1983, 1989-93; 1995-97; 2003, 2006-2010)
Land Development (1984-85)
Securities Law (1990-91)
Workshop in Legal Theory (1989-91)
Seminar on Financial Institutions (1992-93 (with Merton Miller); 1996-97)
Ethics in Class Action Practice (Continuing Legal Education Seminar 2002-2005)
Law and Economics (University of Basel, Switzerland 2005, 2007, 2008)

51

Page 463

Advanced Seminar on Law and Economics (University of Genoa, Italy 2008)
Banking and the Financial Crisis (University of Genoa, Italy 2009)
Trust, Risk, and Moral Hazard in Financial Markets (University of Genoa, Italy, 2010)
International Banking (University of Sydney, Australia, 2002, 2006)
Introduction to Banking Law (University of Basel, Switzerland 2001, 2002, 2003, 2004, 2009, 2010 (invited))
Banking in the Theory of Finance (University of Frankfurt, Germany 2004, 2005)
Banking Regulation in Crisis (University of Frankfurt, Germany, 2010)

## Litigation and Alternative Dispute Resolution

Brief and Reply Brief for Plaintiff-Appellant, Glancy v. Taubman Centers, Inc. No. 03-1609 (6th Cir. 2003).

Amicus Brief for American Bankers Association, et al., In Re: Visa Check/Mastermoney Antitrust Litigation, 280 F.3d 124 (2d Cir. 2001) (of counsel)

Briefed and argued Moran v. Household Finance Corp. (the "Poison Pill" case) in the Supreme Court of Delaware (1985)

Briefed cases in the U.S. Supreme Court, U.S. Court of Appeals, U.S. District Courts, and state trial and appellate courts.  Conducted depositions and other pretrial discovery.  (1982-1983)

Briefed and argued Hodges v. Metts, 676 F.2d 1133 (6th Cir. 1982), on behalf of the United States.

Conducted trial of American Psychological Association v. Birch Tree Press, et al. (U.S. District Court, Washington, D.C. 1983).

Deposit Insurance for Thailand.  Prepared a draft deposit insurance law for Thailand, at the request of the International Monetary Fund (1999)

Schatz v. Blanchard.  Neutral arbitrator in a commercial arbitration (2000)

## Expert Witness Testimony (past five years)

Lasker v. Kanas (North Fork Bancorporation Litigation), Index No. 06/103557, Supreme Court of the State of New York, County of New York (2007) (affidavit on fees)

John Hancock Life Insurance Co. v. Goldman, Sachs & Co., No. 01-10729-RWZ, United States District Court, District of Massachusetts (2007) (declaration on fees)

Comes v. Microsoft Corp., No. CL8211, Iowa District Court for Polk County (2007) (affidavit on merits relief and affidavit on fees)

Figueroa v. Sharper Image Co., Case No.: 05-21251, United States District Court, Southern District of Florida (2007) (declaration and testimony on coupon relief).

Love v. Blue Cross & Blue Shield Association, et al., No. 03-21296-CIV-MORENO/SIMONTON, United States District Court, Southern District of Florida (2007) (declaration in opposition to settlement)

Feuerabend v. UST, Inc., Case No. 02-CV-7124, Wisconsin Circuit Court for Milwaukee County (2007) (affidavit on fees and settlement; testimony at fairness hearing)

White v. Experian Information Solutions, Inc., Case No. 05-cv-1070, United States District Court for the Central District of California (2009) (declaration on fairness of settlement and fee award)

In re Trans Union Corp. Privacy Litigation, MDL Docket No. 1350, United States District Court for the Eastern District of Illinois (2008) (declaration on certification)

Hoffman v. American Express, Case No. 2001-022881, Superior Court for the State of California, Alameda County (2008) (deposition on claim preclusion issue)

In re Pet Foods Products Liability Litigation, MDL Docket No. 1850, Civil Action No. 07-2867 (NLH), United States District Court for the District of New Jersey (declaration on attorneys' fees)

Hensley v. Computer Sciences Corp., No. CV-2005-59-3, Circuit Court of Miller County, Arkansas (2008) (affidavit and deposition on certification)

EM Ltd. and NML Capital, Ltd. v. The Republic of Argentina and Banco de La Nación Argentina, No. 08 Civ 7974 (TPG), United States District Court for the Southern District of New York (declaration and responsive declaration on whether a state-owned financial institution is an alter-ego of the government) (2009); second supplemental declaration (2010)

Tucker v. Scrushy, et al., Nos. CIV-02-5212, CV 03-3522, CV 03-2023, CV 03-2420, CV 98-6592, Circuit Court of Jefferson County, Alabama, 2008 (affidavit on fees) (2009)

In Re: 2007 Wildfire Class Litigation, Master Case No. 2008-00093086, Superior Court of California, County of San Diego (2009) (affidavit and deposition on certification)

In re: Columbia Hospital for Women Medical Center, Inc., Case No. 09-00010 (Teel, J.), United States Bankruptcy Court for the District of Columbia (declaration on fees) (2009)

In re Vioxx Products Liability Litigation, Civil Action No. 2:05-MD-01657-EEF-DEK, United States District Court, Eastern District of Louisiana (affidavit on fee-capping order) (2009)

53

Chivers v. State Farm Fire & Casualty Co., NO.: CV-2004-294-3, Circuit Court of Miller County, Arkansas (2008) (affidavit on certification)

State of Missouri v. SBC Communications, Inc., No. No. 044-02645, Circuit Court of the City of St. Louis, Missouri (2009) (affidavit on fees)

Alexander v. Nationwide Mutual Insurance Co., No. CV-2009-120-3, Circuit Court of Miller County, Arkansas (2009) (affidavit on fees)

Peterman v. North American Company for Life and Health Insurance, Case No. BC357194, Superior Court of the State of California, County of Los Angeles (2009) (declaration on fees)

Holman v. Student Loan Xpress, Inc., Case No. 8:08-cv-00305-SDM-MAP (Middle District of Florida, Tampa Division) (2009) (declaration on fees)

Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase, No. 09-00686 (Southern District of New York) (2010) (declaration on class certification)

Polion v. Wal-Mart Stores, Inc., No. 01-03645 (Superior Court of Massachusetts, Commonwealth of Massachusetts) (2010) (declaration on fees; supplemental declaration on fees and motion to strike counsel)

In re MoneyGram International, Inc. Securities Litigation, No. 08-883 (DSD/JJG), United States District Court, District of Minnesota (2010) (declaration on fees)

Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A., No. 09-cv-00686 (SAS) (DF), United States District Court for the Southern District of New York (2010) (declaration and deposition on certification)

Coffey v. Freeport-McMoran Copper & Gold, Inc., No. CJ-2008-68, District Court of Kay County, State of Oklahoma (2010) (affidavit on certification)

In Re Puerto Rican Cabotage Antitrust Litigation MDL Docket No. 3:08-md-1960 (DRD), United States District Court for the District of Puerto Rico (2010) (declaration on fees)

In re XTO Energy Shareholder Class Action Litigation, No. 352-242403-09, District Court of Tarrant County, Texas, 352nd Judicial District (2010) (affidavit on fees)

The Board Of Trustees of The Southern California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon, Civil Action No. 09-Cv-06273, Southern District of New York (declaration on certification)

## Other Activities

Member, Board of Directors, American Law and Economics Association (1996-1999)

Member, Board of Advisors, The Independent Review (1996-present)

Member, Board of Advisors, Asian Institute of International Financial Law (2001-present)

Member, Editorial Advisory Board, Supreme Court Economic Review (1995-present)

Member, Editorial Advisory Board, The Brookings-Wharton Papers on Financial Policy (1997-present)

President, Section on Financial Institutions and Consumer Financial Services, American Association of Law Schools (1999)

President, Section on Business Associations, American Association of Law Schools (1995)

Member, Board of Contributors, American Bar Association Preview of Supreme Court Cases (1985-1993)

Consultant, Administrative Conference of the United States (1988-89; 1991-1992)

Board of Directors and Volunteer Listener, D.C. Hotline (1980-83)

## Awards

1992 Paul M. Bator Award for Excellence in Teaching, Scholarship and Public Service, from the Federalist Society for Law and Public Policy Studies

## Languages

Reading knowledge of Spanish, French, and Italian.

## Personal

Born October 17, 1950

Children Jason (b. 1986) and Forrest (b. 1987).

## Shorter Works

Defusing The Banks' Financial Time Bomb: Without Tough Reforms, Writes Robert Pozen, We'll Probably Face An Ugly Repeat of Recent History (Business Week, March 11, 2010)

Why Interstate Banking is in the National Interest, Testimony Before the Subcommittee on Financial Institutions Supervision, Regulation and Deposit Insurance of the House Committee on Banking, Housing and Urban Affairs (September 29, 1993)

Challenging the Concept of the Common Law as a Closed System, Columbia Law School Report, Autumn, 1993 (with Norman Silber)

The Insurance Industry's Antitrust Exemption: A Longstanding Tradition Faces its Greatest Challenge, 1992-93 ABA Preview of Supreme Court Cases 198 (1993)

Shootout at the Escheat Corral, 1992-93 ABA Preview of Supreme Court Cases (1993)

Choices and Chances for Consumers, Legal Times, Oct. 12, 1992, at 29-30.

Impeachment Procedures: An Unexplored Territory in the Separation of Powers, 1992-93 ABA Preview of Supreme Court Cases 39 (1992)

An (Ex)changing of the Guard, 21 Journal of Legal Studies iii (1992)

Revisiting the Contingency Factor in Fee-Shifting Awards, 1991-92 ABA Preview of Supreme Court Cases 327 (1992)

The Foreign Sovereign Immunities Act and the Market for Public International Debt, 1991-92 ABA Preview of Supreme Court Cases 307 (1992)

Return of the Tenth Amendment?: Federal Control and State Autonomy over Low Level Radioactive Wastes, 1991-92 ABA Preview of Supreme Court Cases 284 (1992)

What are the Limits on Congressional Power to Influence Pending Cases?, 1991-92 ABA Preview of Supreme Court Cases 158 (1991)

RICO Standing for Securities Fraud: Does the Purchaser-Seller Rule of Rule 10b-5 Apply?, 1991-92 ABA Preview of Supreme Court Cases 155 (1991)

Banking and Investment: Introduction to UPA Index and Microfiche Collection (University Publications of America 1991)

Source of Strength in the Court: Can Bank Holding Companies be Required to Support Failing Subsidiary Banks?, 1991-92 ABA Preview of Supreme Court Cases 42 (1991)

Source of Strength: A Source of Trouble, Legal Times, September 30, 1991 (Special Supplement, pp. 22-25)

The Once and Future American Banking Industry, The American Enterprise (with Jonathan R. Macey)(1991)

The Former Stockholder as Plaintiff in Short-Swing Trading Cases, 1990-91 ABA Preview of Supreme Court Cases (1991)

Disposing of Demand Excuse in Derivative Litigation, 1990-91 ABA Preview of Supreme Court Cases (1991)

Up in the Air: Can Congress Require States to Appoint Members of Congress to State Agencies?, 1990-91 ABA Preview of Supreme Court Cases 294 (1991)

The Statute of Limitations under Rule 10b-5, 1990-91 ABA Preview of Supreme Court Cases (1991)

Tort Claims Against Federal Banking Agencies: New Hope For Shareholders and Officers of Failed Depository Institutions?, 1990-91 ABA Preview of Supreme Court Cases 94 (1991)

Punitive Damages Redux: If the Eighth Amendment Doesn't Apply, What About the Due Process Clause?, 1990-91 ABA Preview of Supreme Court Cases 47 (1990)

Quandaries of Causation: Proxy Solicitation in Freeze-Out Mergers, 1990-91 ABA Preview of Supreme Court Cases 57 (1990)

Racial Statesmanship, Legal Times S31 (July 23, 1990)

Eurodollars, Sovereign Risk, and the Liability of U.S. Banks for Deposits in Foreign Branches, 1989-90 ABA Preview of Supreme Court Cases 281 (1990)

When is a Note a Note?, 1989-90 ABA Preview of Supreme Court Cases 18 (1990)

Interstate Banking and the Commerce Clause, 1989-90 ABA Preview of Supreme Court Cases 168 (1990)

Federal Courts, Municipalities, and the Contempt Power, 1989-90 ABA Preview of Supreme Court Cases 37 (1989)

Shoe Could Still Drop on Issue of Punitive Damages, National Law Journal (August 21, 1989)

Punitive Damages and the Constitution, 1988-89 ABA Preview of Supreme Court Cases 391 (1989)

States, Bankruptcy and the Eleventh Amendment, 1988-89 ABA Preview of Supreme Court Cases 412 (1989)

Stockholders, Arbitration, and the Securities Act of 1933, 1988-89 ABA Preview of Supreme Court Cases 383 (1989)

Appropriations Riders, Nondisclosure Agreements, and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 375 (1989)

Judicial Appointments and the ABA: Business as Usual or Brand New World?, 1988-89 ABA Preview of Supreme Court Cases 379 (1989)

S & L Receiverships, State Law, and the Federal Courts, 1988-89 ABA Preview of Supreme Court Cases 255 (1989)

The Non-delegation Doctrine in Taxation: A Different Constitutional Calculus?, 1988-89 ABA Preview of Supreme Court Cases 26l (1989)

Bankruptcy, Tax Liens, and Post-Petition Interest, 1988-89 ABA Preview of Supreme Court Cases (1989)

Federal Courts, State Taxes: A Vexing Dilemma For the Enforcement of Civil Rights in a Federal System, 1989-90 ABA Preview of Supreme Court Cases 95 (1988)

Separation of Powers and the Sentencing Commission, 1988-89 ABA Preview of Supreme Court Cases 23 (1988)

Administering the Savings and Loan Crisis: New Problems for the FSLIC, 1988-89 ABA Preview of Supreme Court Cases (1988)

Federal Procurement and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 26 (1988)

Thinking About a Career in Law, 1988-89 Talbot's Student Planning Book 32 (1988)

Carl McGowan: A Great Judge Remembered, 56 George Washington Law Review 697 (1988)

Separation of Powers: The Independent Counsel Case Tests the Limits, 1987-88 ABA Preview of Supreme Court Cases 390 (1988)

Decisionmaking in Collegial Bodies, Judicature, April/May 1988

The FDIC, Bank Officers and the Due Process Clause, 1987-88 ABA Preview of Supreme Court Cases 326 (1988)

Farm Foreclosures in Bankruptcy, 1987-88 ABA Preview of Supreme Court Cases l99 (1988)

Equal Access to Justice and Government Litigation, 1987-88 ABA Preview of Supreme Court Cases 160 (1988)

The Time Value of Money in Bankruptcy Cases, 1987-88 ABA Preview of Supreme Court Cases 116 (1987)

Getting the Fee First?: Attorneys and the SSI Program l987-88 ABA Preview of Supreme Court Cases 118 (1987)

The Farmer and the FDIC, 1987-88 ABA Preview of Supreme Court Cases 48 (1987)

Testing the Limits of Securities Fraud: Financial Gossip in the Court, 1987-88 ABA Preview of Supreme Court Cases 26 (1987)

Checks and Balances in the Twenty-First Century, 33 University of Chicago Law School Record 7 (1987)

Separation of Powers May Become Focus Over NSC, Legal Times, Dec. 15, 1986, at 15

If a Bank is a Broker, is a Brokerage a Branch? 1986-87 ABA Preview of Supreme Court Cases 65 (1986)

Attorney's Fees in the Supreme Court, American Bar Association Journal 40 (November, 1986)

The Contingency Factor in Attorney's Fees Reconsidered, 1986-87 ABA Preview of Supreme Court Cases 20 (1986)

Restitution and Bankruptcy in a Federal System, 1986-87 ABA Preview of Supreme Court Cases (1986)

Don't Limit Contingent Fees, Chicago Tribune, June 11, 1986

The Budget and the Separation of Powers: Gramm-Rudman in the Court, 1985-86 ABA Previews of Supreme Court Cases 359 (1986)

Keeping Attorneys Fees in Proportion, 1985-86 ABA Preview of Supreme Court Cases 325 (1986)

Must the Federal Government Pay Interest on Attorneys Fees Awards?, 1985-86 ABA Preview of Supreme Court Cases 241 (1986)

The Contingency Factor in Attorneys Fees Awards, 1985-86 ABA Preview of Supreme Court Cases 243 (1986)

The FCC as Cop: Forcing State Public Service Commissions to Obey Federal Agency Orders, 1985-86 ABA Preview of Supreme Court Cases 191 (1986)

Preemption, Public Utilities, and Power Over Telephone Rate-Setting, 1985-86 ABA Preview of Supreme Court Cases 187 (1986)

59

A Bank is a Bank is a Bank -- or is it?, 1985-86 ABA Preview of Supreme Court Cases 67 (1985)

Settlement Offers Conditioned on Waiver of Attorneys' Fees: A Legal and Ethical Dilemma Confronts the Court, 1985-86 ABA Preview of Supreme Court Cases 55 (1985)

Bankruptcy and the Environment: The Case of Hazardous Wastes, 1985-86 ABA Preview of Supreme Court Cases 25 (1985)

A Different Approach to Interstate Banking, American Banker (August 8, 1985)

The SEC as Censor: Is Banning an Investment Advice Newsletter a Prior Restraint of the Press?, 1984-85 ABA Preview of Supreme Court Cases 243 (1985)

Enforcing Federal Rights in State Courts, 1984-85 ABA Preview of Supreme Court Cases 277 (1985)

Interstate Banking and the Constitution, 1984-85 ABA Preview of Supreme Court Cases 364 (1985)

The "Sale of Business" Doctrine in the Supreme Court, 1984-85 ABA Preview of Supreme Court Cases 344 (1985)

Sale of Business Revisited: Does the Doctrine Apply to Partial Sales of Corporate Control, 1984-85 ABA Preview of Supreme Court Cases 347 (1985)

Six Cases Shape Business Law, American Bar Association Journal 124 (Jan. 1985)

Offers of Settlement in Civil Rights Cases Pose Attorneys' Fees Question, 1984-85 ABA Preview of Supreme Court Cases 105 (1984)

Using Bankruptcy to Avoid Liability for Cleaning up Toxic Wastes, 1984-85 ABA Preview of Supreme Court Cases 36 (1984)

A Judicial Footnote Cemented the New Deal, Wall Street Journal, September 13, 1984

May Bank Holding Companies Provide Discount Brokerage Savings?, 1984-85 ABA Preview of Supreme Court Cases 575 (1984)

Blum v. Stenson:  Fundamental Questions About Attorneys' Fees Awards to Public Interest Lawyers, 1984-85 ABA Preview of Supreme Court Cases 301 (1984)

Myths on the Midway, 30 Chicago Law School Record 13 (1984)

Smith v. Robinson:  Another Step Towards Solving the Attorneys' Fees Puzzle? 1983-84 ABA Preview of Supreme Court Cases 437 (1984)

60

Securities Industry Association v. Board of Governors:  Can Banks Distribute Commercial Paper? 1983-84 ABA Preview of Supreme Court Cases 425 (1984)

The "7-Eleven" Case:  Arbitration v. Litigation in a Federal System, 1983-84 ABA Preview of Supreme Court Cases 161 (1983)

The Bildisco Case:  Reconciling Federal Bankruptcy and Labor Policies, 1983-84 ABA Preview of Supreme Court Cases 169 (1983)

The "Daily Income Fund" Case:  What Role Should a Mutual Fund's Board of Directors Play in Disputes over Investment Advisor Fees, 1983-84 ABA Preview of Supreme Court Cases 107 (1983)

Pulliam v. Allen:  Should State Judges who Act Unconstitutionally Pay the Plaintiff's Attorneys' Fees?, 1983-84 ABA Preview of Supreme Court Cases 115 (1983)

"Shortsighted" Bill Proposes D.C. Court Divestiture, Legal Time of Washington, August 16, 1982

The Tax Bill May Be Unconstitutional, Baltimore Sun, August 16, 1982 (with Donald N. Bersoff)